95 F.Supp. 384 (1950)
UNITED STATES
v.
UNITED STATES CARTRIDGE CO.
No. 2486.
United States District Court E. D. Missouri, E. D.
November 21, 1950.
*385 *386 H. G. Morison, Asst. Atty. Gen., Drake Watson, U. S. Atty., of New London, Mo., William V. O'Donnell, Asst. U. S. Atty., of St. Louis, Mo., Joseph M. Friedman, Chief, Frauds Section, and J. Gregory Bruce, George W. Meuth and Charles W. Tayler, Attorneys, Department of Justice, all of Washington, D. C., for plaintiff.
R. H. McRoberts, Marion S. Francis, and Bryan, Cave, McPheeters & McRoberts, all of St. Louis, Mo., for defendant.
HULEN, District Judge.

I.
Plaintiff sues to recover forfeitures and double damages (by brief plaintiff asks judgment for $214,878,725.12) under the fraudulent claims statutes, U.S.Code Annotated, Title 31, § 231, based on payments for ammunition delivered by defendant to plaintiff between "February 1, 1942 and October 31, 1943", on a cost plus fixed fee contract dated December 5, 1940.
Defendant denies receiving any money from plaintiff by presenting "false" claims; further it denies that its representatives having supervisory authority of the manufacturing plant "as a whole" did personally fail "to exercise good faith" or usual care in execution of the contract, which defendant claims to be a condition precedent to fixing liability under the contract. The trial, before the Court by jury waiver, represents over three thousand pages of record, plus six hundred and seven exhibits, many of which are voluminous in themselves.
The amended complaint contains eight assignments of fraud directed to specific instances in either the manufacturing, inspecting processes, or packing and delivery *387 of small arms ammunition, under the contract.
The answer pleads (third defense) plaintiff sustained no pecuniary loss; (4) defendant was entitled to its fixed fees under the terms of the contract; (5) no representatives of defendant having supervision of the plant as a whole had knowledge of any of the acts complained of; (6) no agent of defendant having any duty in connection with the preparation of the claims had any knowledge of any of the acts complained of; (7) repeats the fifth defense by way of pleading estoppel under the terms of the contract; (8) alleges conduct of defendant met terms of contract and that plaintiff by the contract has waived and released defendant from any claim under it; (9) settlement of all claims under the contract requiring submission of all disputes to plaintiff's contracting officers; (10) plaintiff has administratively determined defendant performed the contract; (11) the contract requires arbitration of all disputes; (12) settlement of all claims by subsequent contract for sufficient consideration; (13) release; (14) accord and satisfaction; (15) bar by virtue of release; (16) bar by settlement of all claims between the parties. Defenses 9 to 16, inclusive, were stricken on motion. See 78 F.Supp. 81.
Twenty-five vouchers representing claims by defendant, on which plaintiff made payments under the contract, are identified in paragraph 6 of the amended complaint. These vouchers cover the period February, 1942 to September, 1943. By amendment to the amended complaint it is charged that due to the specific acts of fraud described, each of the vouchers constituted a false claim under the statute. Plaintiff charges that due to avoidance of inspection requirements defendant "on numerous occasions between February 1942 and October 1943 * * * permitted defective" ammunition to flow into production and become a part of lots of ammunition accepted by plaintiff.
The issues: First, is defendant guilty of fraud under the purview of the false claims statute; second, if so do the terms of the contract relieve defendant of liability.

II.
Defendant is a wholly owned subsidiary of the Western Cartridge Company[1], now Olin Industries, Inc. In 1940 plaintiff solicited Western, through John M. Olin, President of Western, to undertake the manufacture of small arms ammunition. Western was one of two major industrial organizations in this country with substantial experience in the field of production of ammunition for war purposes. Mr. Olin was reluctant to have Western undertake the enterprise because its production capacity was then extended. While in Washington in the latter part of 1940, Mr. Olin learned of the serious weakness in the arms reserves of this country due in part to shortage of ammunition resulting from furnishing England with arms and ammunition after the lifting of the English and French armies at Dunkirk. Negotiations followed which resulted in execution, on December 5, 1940, of the contract for operation of the St. Louis Ordnance Plant for plaintiff by defendant.
The St. Louis Ordinance Plant was located in the City of St. Louis, a location influenced by the problem of securing personnel for its operation. Over four million square feet of floor space was provided in three hundred separate buildings on a large site of several hundred acres.
Burdett E. Bassett was general manager of the St. Louis Ordnance Plant. He had been general superintendent of Western's plant at East Alton. As general manager he was given authority by the officers of the defendant company to carry out the terms of its contract with plaintiff. With a skeleton force of trained employees obtained from Western, defendant through Mr. Bassett took over the St. Louis Ordnance Plant from its inception, installing equipment and securing and increasing production as individual buildings on the site were completed. The men obtained from Western were used to instruct new employees. Training schools for this purpose *388 were set up. There were over 80,000 employees engaged, at various times, in operation of the plant during the war period. Of these less than fifty had experience in manufacture of small arms.
Defendant experienced difficult problems in securing proper machine tools and getting them adjusted and running properly. That was only part of their troubles. Many people hired left during the training period, others before they were assigned to jobs, and others soon after they went on the production line. In securing and retaining personnel, defendant competed with other war and commercial industries in the City of St. Louis and manpower calls by the Armed Services. Many of the employees were without previous experience in any manufacturing. Some were engaging in salaried work or factory routine for the first time. Some were actuated solely by patriotic motives to help in the war effort.
We are concerned with a period of grave national crisis. Both plaintiff and defendant sought to impress the employees with the importance of their work in the successful waging of war, and the imperative need of the Armed Forces for the product of the plant. Armed guards patrolled the grounds. They were at every gate. Sabotage warnings were posted throughout the plant. Many of the employees had members of their immediate families in the Armed Forces, some serving overseas.
These circumstances together with outside influence, present when a nation is at war, tended to create an atmosphere of suspense. There was keen alertness, in the furtherance of what was considered a patriotic duty, to discover evidence of irregularity in production of ammunition. Some employees made reports to the Federal Bureau of Investigation. An investigation followed. On December 21, 1943 eleven employees were indicted for violating Title 18, Section 88,[2] and Title 50, Section 103[3] of the United States Code. The indictments charged the defendants named with conspiracy to defraud in performing certain acts and utilizing certain devices whereby defective ammunition was delivered to the United States in violation of the contract made between the United States and the United States Cartridge Company. Of the eleven indicted seven were part time[4] employees and four were full time[5] employees in supervisory capacities. One case naming five of the eleven employees was tried in April 1944, resulting in acquittal of all defendants. The remaining cases were dismissed shortly before this case went to trial and some of the defendants were used as witnesses in this case.
On January 6, 1943, a special board of inquiry was appointed by the United States Ordnance Department to investigate operations of the plant, with particular attention to inspection procedure and equipment. The report of the board (which some of the members testified they did not agree to in full, although it bears their signatures) found the defendant's operation was "no better nor worse" than the operations of other similar plants. The report commented on lack of mutual confidence among the employees.
Defendant undertook operation of the plant about the middle of 1941 and it was two years before the plant in its entirety was finished and in operation. In some cases manufacturing operations would commence in a building before it was completed. Production was started in Building 105 in January 1942; in Building 104 in November 1941; in Building 102 in February 1942; in Building 103 in April 1942.
Four of the units were devoted to manufacture of .30 caliber ammunition and four to .50 caliber ammunition. Two of the units manufactured primers and loaded tracer bullets. Each of the manufacturing units was complete in itself except for the raw material and primer production.
During maximum production over 30,000 persons were employed on a 24-hour basis of three shifts, six days a week. Eight to *389 ten per cent of the personnel were on a salary basis; the balance were paid by the hour. Operating at its maximum approximately one-fourth of the employees were engaged in inspection and testing duties, ten per cent in keeping production machinery in operating condition, and the remainder in direct production activities. During the history of the plant's operation over seven billion rifle and machine gun cartridges were produced. Production for the period involved in this suit is a matter of speculation. Capacity production was fourteen million cartridges during a twenty-four hour day.
During the years 1942 and 1943 plaintiff exerted constant pressure on defendant to expedite production. We cite an instance  soon after production got under way, the Secretary of War addressed a letter to the Chief of Ordnance containing this paragraph with reference to defendant: "Please see to it that * * * and Mr. Olin of Western are made aware of how critical the situation is on .50 caliber ammunition. There is no time to lose." Shortage of ammunition for our Armed Forces was so critical at times that it was shipped by express. In some instances passenger trains were held past their departure time in order to carry the express cars.
Mr. Bassett had two assistants, Mr. Kelso and Mr. Dawson. Mr. Kelso's duties were devoted to production, Mr. Dawson's to schedules and tool procurement.
Passing down from Mr. Bassett, whose overall supervision included departments that were not concerned with production, G. C. Storms, as general superintendent, had supervisory authority over the production parts or buildings of the plant as a whole. Mr. Storms' assistant was B. E. Rogers. Next in order downward, and upon equal plane, was J. C. Stewart, in charge of plant maintenance; A. E. Allen, in charge of plant control, which had to do with scheduling the raw material into the units; C. E. Krus of the tool and guage department; Mr. Rogers of the manufacturing department; and W. N. Hurley, in charge of inspection department.
Manufacture of small arms ammunition involves many varied and intricate processes. It starts with cupping of raw brass for cartridge cases. After cupping the case goes through a burning field. Before the cup reaches its final shape there are four draws and two trimmings, followed by a heading operation and shaping of the shoulder to receive the bullet. The bullets go through operations, varying according to whether they are tracer or armor piercing. After the case is completed a primer is inserted. Care must be taken that air vents are left open, otherwise the shell will not fire. The primer must be inserted at the proper angle and depth. After the case is loaded with powder, the bullet is inserted. Seventy different manufacturing operations were performed on a shell before it reached completion.
Some of the defects that may develop during the process of manufacture which, depending on their extent, may result or should result in discarding the shell as scrap, or its downgrading from A to B ammunition, are:
Cases  too long or short, have dents and cracks, cracked heads, scratches, folds, wrinkles, round heads, scaly metal, thin heads, insufficient lacquer, defective taper, split necks, no lettering, oil or water in the case. Bullets  blunt point, scratches, too long or too short. Primers  crushed, mashed, loose, inverted, cocked, or too hard. The overall shell may be insufficient in weight, too long or short.
To insure manufacture and delivery of ammunition free from defects a comprehensive system of inspection, consisting of 52 separate inspection and gauging operations, accompanied all steps in the manufacture of the shell and its component parts.
Cups are inspected for deep scratches, bent tops, thickness of the wall, thickness of the base and height. On each of the draws inspections are made of the formation of the case by the use of gauges. The formation of the head on the case is done on a horizontal machine. These machines are under constant inspection. Samples are taken. The head thickness of the *390 case is tested, as are diameter of the head and diameter of the extractor groove. There is a mercury cracking test, mouth and neck anneal test. This is to determine if the case may crack in storage. There are two separate tests, one for the body and one for the mouth. There is a 100% inspection of cartridge cases by the use of a machine. This is a visual inspection of the head and mouth of the case. The inspector looks for buckles, dents, scratches, etc. Fifty to sixty cases of .50 caliber ammunition can be inspected a minute; ninety to ninety-five cases of .30 caliber ammunition a minute. After the primer insert operation, inspectors examine the inside of the case to see if the vent is present, waterproofing is on, and the head of the casing is crimped properly, and the primer is in good condition. This inspection takes place at the primer inserting machine.
Before the metal is formed in the cup, it is inspected as to thickness, in addition to laboratory tests. Before the primer is inserted the anvil of the primer is inspected as to diameter and height. After the anvil is inserted in the cup there is a 100% inspection under a glass of the top of the anvil. Here deep scratches, cocked anvils, inverted anvils, and defective foiling paper are looked for. The cannelures on bullet jackets are made by machines. This process is inspected as to the location of the cannelure, whether there is a long or short cannelure. At the same time the inspector should pick out long bullets, pointed bullets, and examine for scratches and die marks. An inspector performing this duty can inspect sixty or sixty-five bullets a minute. There are separate inspections for tracer bullets and armor piercing bullets. In tracer bullets the mixture must be checked to see if it is too high or low after assembly. After the bullet is inserted in the case by a roller or die into the bullet cannelure, final assembly inspection follows, to see that the bullet pull is sufficient and the powder content is proper and the overall length is correct. This is done by a snap gauge and also a profile gauge. Inspections at the loading machines must be made constantly to see that the bullets are not going in crooked, that the crimp is correct, that the bullets are not being inserted too far or sticking out too long. After the cartridge has been completely assembled it goes to the gauge and weighing machine. In this machine the shell goes into a profile alignment die which is similar to the chamber of a rifle. There is also a gauge for shoulder to head, contour and dimension. The shells are weighed while going through this machine. After the cartridges have been weighed and gauged they go to the inspector's box. Any shells failing to pass the test of the gauge and weigh machine go into reject boxes according to the defect causing their rejection. Ammunition which passes the gauge and weigh machine test is then given a visual 100% final inspection. Here again inspectors look for scratches, dents, bent bullets, bad heads, and other visual defects. Ammunition which passes the 100% visual inspection goes to the Ordnance Department of plaintiff for inspection to determine rejection or acceptance. In addition to the line inspectors, defendant had "reinspect girls". Reinspect girls were from personnel well versed in inspection. They passed upon ammunition which had been rejected by the line inspectors. Inspections not only went to examination of the product during process of manufacture but to the machines producing the product to determine if they were turning out component parts according to specification. Ammunition might be subjected by the Ordnance Department to spot check, laboratory or firing range test, or both. This check was of a small percentage sample of the lot submitted at any given time. Ammunition inspected and accepted by the Ordnance Department was thereby approved for delivery to the packing department for packing and delivery to the shipping department and plaintiff. At one time the Ordnance Department got their samples from the packing room. Later they inspected the ammunition following the 100% visual and weighing and gauging inspection by defendant.

III.
Certain defects in small arms ammunition present hazards when used by men in combat. If water or moisture comes in *391 contact with the primer it could cause a misfire. Such conditions might not affect the primer until days or months after the cartridge has been assembled. Defective primer cups may cause misfires. If the primer cup is too thick or too hard the firing pin will not make a sufficient indentation to detonate the primer mix.
During the latter part of 1942 and 1943, while the American Forces were engaged in the African and Italian campaigns, misfires of cartridges caused guns to jam in planes. Most of the planes were equipped with six guns. There were instances during this period when American flyers returned from missions with one or more, and in some instances all six guns, jammed. This minimized or destroyed the striking power of the plane and subjected the flyer to danger because of their inability to defend themselves. It lowered the morale of those who had the experience. How many flyers failed to return from combat mission for that reason will never be known. A systematic inspection of the ammunition was made in the field. The source of ammunition causing some of the trouble was found to be the St. Louis Ordnance Plant. It was traced by lettering on the shells and shell containers. Some of the ammunition had been repacked after it left defendant's control. Inspection in the field reduced the cause of defective ammunition and jammed guns to corroded shells due to moisture in the shell containers, hard primors which failed to fire upon the firing pins functioning in the regular manner, split cases, thin heads, and loose bullets. During the time the Air Force was receiving this defective ammunition it was being drawn from English ammunition dumps. Subsequently, when the Air Force moved to fields near Naples and received ammunition from American dumps, defective ammunition was no longer found in unusual quantities. During the time ammunition was received from English dumps the containers showed evidence of violence which could have broken the sealed metal liners and permitted moisture to permeate and corrode the shell. The record does not show the quantity of defective shells received by the Armed Forces originating from the St. Louis Ordnance Plant, nor what proportion of defective ammunition was traceable to one or more of the defects mentioned.
Plaintiff, by the contract, had the right of control and to give defendant instructions for the production of ammunition out of certain materials. Prior to September 12, 1942, the brass specifications for the manufacture of component parts of ammunition by defendant was "70-30"  70% copper and 30% zinc. On this date the Government issued orders changing the percentage to "68-32". This order resulted from a shortage of copper. Defendant protested when the change was ordered by plaintiff and declared in plain terms, to representatives of plaintiff, that their experience at Western with "68-32" brass had been unsatisfactory and, in their opinion, satisfactory ammunition could not be made with it. Over defendant's protest defendant was ordered to use "68-32" brass. Due to their anticipation of trouble defendant segregated its use to buildings 105 and 204. Defective ammunition in those buildings resulted immediately. Cartridges showed up with scaly metal, cracks, laminations, folds, and cracked heads. During the use of "68-32" brass personnel in the manufacturing and inspection departments were alerted to watch for the defects anticipated and to scrap all shells showing such defects. "68-32" brass was in use for approximately three months, then the order for its use was rescinded by plaintiff. Defendant was not permitted to give the reason for its use and this, together with the defects that resulted, could have created suspicion among the personnel. Shortly after the time of its use there appeared in a daily newspaper in the City of St. Louis a news item about the production of defective ammunition by defendant, and a picture of a cartridge with a cracked head, this being one of the types of defects which were anticipated by the use of "68-32" brass. Even under these circumstances defendant was compelled to remain silent as to the reasons for use of "68-32" brass. Not until this trial were these facts made public. Following publicity on production of defective ammunition the Board of Inquiry *392 was set up by the Ordnance Department and some employees indicted.
Another accepted procedure in production of ammunition was mouth and neck anneal tests. This test has a tendency to accelerate the aging of metal, so certain defects such as cracks which might ordinarily take months to occur or become observable, show up under the mouth and neck anneal test. On March 3, 1942 plaintiff instructed defendant to omit the mouth and neck anneal tests and these tests were not reinstated until late in 1942. As a result of elimination of these tests, cracks may have developed in the casing resulting in loose bullets and other defects that could cause misfire and jammed guns. The cracking resulting in the loose bullets may have developed or become apparent long after the ammunition left the plant.

IV.
The prime issue turns on interpretation of the December 5th, 1940 contract. Contract negotiations were started by the Government submitting a form. From the outset Mr. Olin insisted the contract contain a clause limiting defendant's liability to personal failure on the part of the corporate officers of defendant, or other representatives of the defendant having supervision and direction of the operation of the plant as a whole, to exercise good faith or that degree of care which they normally would exercise in the conduct of the contractor's business. A provision to that effect appears in the contract in four different sections.
A preliminary statement attached to the contract sets forth that the Government contemplates a contract "for management service covering supervision, direction and control of the production aspects" of the plant and for training key personnel. The latter service is covered by paragraph 1, Article I-B of the contract. In paragraph 9 of Article I-B the liability limitation provision relied upon by defendant as a defense to this action[6] appears for the first time.
Article I-D provides for reimbursement for expenditures made by defendant in operating the plant and its fixed-fee compensation.[7]
Article I-E specifies defendant is to do all things necessary about the operation of the plant including employment of all persons engaged in work under the contract "who shall be subject to the control and constitute employees of" defendant.
Article I-F requires the contractor to maintain "a satisfactory system of inspection, gaging and gage checking" and further provides that no ammunition "shall be submitted for the Government inspector's *393 approval" which has not previously been inspected by the defendant and found to be up to the contract standard.
Title II of the contract, sub-paragraph 1 of Article II-A goes to the subject of reimbursement  the Government to pay "all costs and expenses of every character and description" incurred by the contractor. Again in sub-paragraph 1(g) of Article II-A appears a provision that losses and expenses actually sustained by the contractor and found not due "to the personal failure on the part of the corporate officers of the Contractor or of other representatives of the Contractor having supervision" of the operation of the plant as a whole, "to exercise good faith or that degree of care which they normally exercise in the conduct of the Contractor's business", shall be borne by the Government. Subparagraph 1(k) of this title provides for administrative expense "incident to the operation of the Plant" of $60,615.00 per month. Subparagraph 1(1) of this title provides the defendant shall be reimbursed "for Ammunition reworked because of rejection and for Ammunition finally rejected". Expenses of operation were to be reimbursed weekly. The fixed-fee compensation was to be paid monthly, based on ammunition accepted.
Title III defines the position of defendant as that of an independent contractor and "in no wise an agent of the Government".
Article III-C, paragraph 1, empowers the Government to require defendant to dismiss any employee the Government deems incompetent "or whose retention is deemed to be not in the public interest".
Paragraph 2, Article III-C, requires defendant to use all reasonable efforts in all acts under the contract to protect the interest of the Government.
Subparagraph 1 of Article III-F makes the approval of the Government a condition for the "extent and character of the work to be done by the" defendant under the contract. In case of dispute as to extent and character of work "the decision of the Contracting Officer" of the Government "shall govern".
Subparagraph 3 of the same Article specifies that title to all work completed or in course of manufacture, to all ammunition completed or in process of being manufactured, shall be in the Government; also to all materials, tools, and equipment.
In paragraph 5 of Article III-F again appears the limitation of liability provision with respect to relieving defendant from liability "for any failure or delay in the performance of this contract, or accountable for the loss or destruction of or damages to any materials, tools, machinery, equipment, supplies, Ammunition or other property located or stored at said Plant or used in connection with the operation thereof".
Subparagraph 2 of Article III-G gives the Government power at all times to inspect the work, and to do this the representatives of plaintiff at all times were given "access to the premises, work and materials" and the books and records of "every description" of the defendant.
Article III-P sets forth that the contractor shall submit to plaintiff's Contracting Officer within a reasonable time after execution of the Contract "a chart showing the executive and administrative personnel to be regularly assigned for full or part-time service in connection with the work under this contract, together with a written statement of the duties of each person and the administrative procedure to be followed by the Contractor for the control and direction of the work". This chart was to be kept up to date.
Article III-Q empowers the Government "at any time, by a written order * * * [to] make changes in or additions to the drawings and specifications, issue additional instructions, require additional work * * *, or direct the omission of work covered by the contract". [Emphasis added throughout Division IV.]

V.
The certificate with respect to violation of Section 80 is on the back of the voucher. Defendant argues it was not signed by anyone representing the defendant. It is true that defendant's signature appears *394 only under the certificate containing the language first quoted, but in the margin opposite defendant's signature there appears: "certificate(s) on reverse side made a part of this voucher". The voucher is fairly susceptible of the construction, defendant's signature on the front of the voucher covers the certificate on the back of the voucher. It is immaterial whether it does or not. Defendant's servant certified that the voucher "is correct and just". If it was a false voucher it would not be a just voucher. The certificate, that the voucher is "just" is broad enough to cover the matters referred to in the certificate on the back of the voucher. If the defendant is liable, and to the extent of liability under the contract, for acts of fraud of its servants in connection with performance of the contract, it would be liable if there were no certificate of any character on the voucher, because when defendant presented the voucher to the plaintiff for a payment under the contract, it impliedly represented the payment to be honestly due defendant under the contract terms.
This question we dispose of now so as to find the base for the charge in this case. It is, first, the statute on false claims and, second, the claims for compensation filed by defendant with plaintiff. We now pass to a consideration of the issues, legal and factual.

VI.
In view of certain theories regarding liability, legal and factual, now being urged, at the outset we delineate the character of case with which we are concerned.
Plaintiff charges the defendant with violation of the False Claims Statute, Title 31, § 231, U.S.C.A., the pertinent part of which reads: "Any person [individually or by conspiracy] * * * [1] who shall make or cause to be made, or present or cause to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, or [2] who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, * * * shall forfeit * * * the sum of $2,000, and * * * double the amount of damages * * * sustained * * *."
Broadly, we are called on to determine  did the defendant by virtue of acts of its servants, for which it is responsible, make or cause to be made, and present to the plaintiff, false claims for the payment of money resulting from performance of the contract for the manufacture by defendant of small arms ammunition.
The claims in suit are vouchers, twenty-four in number, but identical in the representation claimed by plaintiff to be false and therefore proscribed by the statute. There is supporting data attached to each voucher, which plaintiff would class under the second part of the statute. The vouchers, over the signature of the defendant's servant, contain this provision: "I certify the above bill is correct and just". On the back of each voucher is an additional certificate: "I certify that I am familiar with the provisions of Section 35 of the Federal penal code, as amended (Title 18, United States Code, Section 80) and that I have not, nor has any one acting for or in my behalf of the firm or company which I represent committed any act or offense denounced by the said Section 35 in connection with the transactions for which reimbursement is sought on this voucher."[8]
The burden of proof rests upon plaintiff. As to proof necessary to sustain the burden, the authorities which have ruled cases under the False Claims Statute appear to be uniform in their holdings. "To prevail, the United States must prove fraud of some sort. Fraud implies a misrepresentation of material fact, either express *395 or implied." See United States ex rel. Weinstein v. Bressler, 2 Cir., 160 F.2d 403, loc. cit. 405. Plaintiff must go further and prove the defendant guilty of "knowingly concealing or falsifying material facts or making false or fraudulent statements or representations for the purpose of obtaining approval or payment of such claims by the Government." See Hillgrove v. Wright Aeronautical Corporation, 6 Cir., 146 F.2d 621, 622. There must be an intent to "defraud the government". See United States v. Shapleigh, 8 Cir., 54 F. 126, 128.
To summarize  "Fraud consists in the false representation of a material fact, made with knowledge of its falsity and with the intent to deceive the other party, which representation must be believed and acted upon by the party deceived to his damage." See Cahill v. Curtiss-Wright Corporation, D.C., 57 F.Supp. 614, 616.
Plaintiff cannot sustain the burden of proof by offering evidence there was a false representation in the claim for money for ammunition presented to plaintiff by the defendant, but must go further and present a record containing substantial evidence on which to base a finding that the defendant in presenting the false claim did so with the knowledge of its falsity and with intent that the plaintiff would rely and act on such false representation, and that the plaintiff did believe and rely on such false representation. It follows that evidence of irregular acts standing alone, even if fraudulent, in the process of manufacturing ammunition, do not meet the test to make a case under the statute: "The fraud must be used in connection with making a claim against the Government". See Cahill v. Curtiss-Wright Corporation, supra.
Plaintiff in its brief emphasizes a provision of the contract (Title I, Art. I-F) which reads: "The contractor shall maintain a satisfactory system of inspection, gaging and gage checking concurrent with manufacture, and no ordnance material shall be submitted for the Government inspector's approval which has not previously been inspected by agents of the contractor and found to be up to the contract standards."
With this provision of the contract as a premise and certain acts of the employees of defendants, claimed to be fraudulent, inferentially at least, we are asked to conclude that the corporation could not delegate the obligation to set up a satisfactory system of inspection as called for by the contract and is therefore guilty of fraud. As we view this case the system, as such, of inspection set up by defendant has no direct relation to the issues in this case. Failure to set up a system of inspection as called for by the contract is not pled as a basis for any false claim. But if it were, the evidence shows a complicated system of inspection was inaugurated and maintained by defendant that was continually under the scrutiny, both open and secret, of the plaintiff.
We construe the complaint to allege  at least the evidence so shows, and we so find  the acts of the defendant for which plaintiff seeks relief are isolated digressions from the established system of inspection. There were fifty-two separate inspections and gauging operations in production of the cartridge during seventy manufacturing operations. Defendant set up and maintained a school for training employees; it prepared manuals which were examined and approved by plaintiff's Small Arms War Plants Office. Defendant kept production process manuals which described in detail manufacturing operations. There is a large volume of inter-plant communications urging compliance with instructions, that there should be no deviation from specifications, and urging production of high quality ammunition. This was the standard for all manufacturing processes. The contract provides and the evidence shows action in accordance therewith. Defendant was under constant supervision by representatives of the plaintiff. Plaintiff could have terminated the contract at any time. It retained complete control over the operations as to the extent and character of work done by the defendant. It could issue instructions with respect to the manner in which the contract was being executed and ammunition produced. Nowhere *396 in the record do we find any complaint made by plaintiff during execution of the contract that defendant had failed to comply with the terms of the contract calling for setting up of inspection processes.
Plaintiff's present position on this point is in sharp contrast with its declaration at the time contract negotiations were concluded. The original complaint in this case was filed December 21, 1943. On February 9, 1945 an amended complaint was filed. On September 30, 1946, an amendment to the complaint was filed. The record shows that substantially all of the acts of defendant upon which the complaint is based were known to the plaintiff during the plant operation, by plaintiff's inspectors and other agents of the Government. We presume plaintiff had full knowledge of the facts when it filed its amended complaint on February 9, 1945. The renegotiation contract was executed "as of the 30th day of August 1946". We find this paragraph at the top of page 3 of the renegotiation contract: "Whereas, the Contracting Officer, as evidenced by his execution of this instrument, has administratively determined that the Contractor has satisfactorily completed all of its work and and satisfactorily performed all of its obligations under the Contract."
We conclude the record is without substance to support plaintiff's claim of a violation of the contract by failure to maintain a satisfactory system of inspection, or that such failure constituted fraud leading to a false claim.

VII.
We now go to the allegations of fraud contained in the complaint and the specific acts plaintiff claimed to support them, to determine, absent contract terms relied on as a defense, whether or not there is fraud in any one or more of the particulars charged.
Paragraph 5 of the amendment to the amended complaint sets forth certain "schemes, tricks and devices employed by the defendant" out of which it is charged that the falsity of the claims grew.
Subparagraphs (a), (b), (e), (f), (g) and (h) we have placed in one division because each charges acts of the defendant in the process of manufacture of ammunition prior to and including delivery of the ammunition to the United States Ordnance Department for its inspection, as a result of which plaintiff either accepted the ammunition or rejected it.
Subparagraphs (c) and (d) of paragraph 5 describe conduct of the defendant with respect to actual delivery of ammunition to plaintiff, and discussion of these two subparagraphs we treat last.

(a)
Subparagraph (a) charges: "On October 16, 1942 the defendant did submit some 700,000 rounds of .50 caliber ammunition for acceptance by the United States without having subjected the same to satisfactory visual inspection. This was accomplished by placing skids of ammunition within the U. S. Ordnance Department area as having been fully visually inspected and ready for acceptance, whereas such ammunition had been in fact only `spot-checked' or not finally inspected at all."
As to details and parties present on October 16, 1942, in Building 105, there is dispute between plaintiff and defendant, but that defendant did submit a substantial quantity of ammunition at this time for acceptance by the United States Ordnance Department without 100% visual inspection is not denied by defendant. There was a bank of approximately 700,000 rounds of ammunition in Building 105 on the morning of October 16, 1942. During that day this ammunition was passed to the Ordnance Department for inspection and acceptance. The ammunition so delivered contained a large quantity that received no visual inspection at that time by the defendant's inspectors.
A general inspector by the name of Paul Thaller had supervision of the inspection in Building 105. Mr. DeGrote, assistant chief inspector of the company's manufacturing units as a whole, was in the area where the bank of ammunition was located during the morning of October 16th. Mr. *397 Thaller testified, Mr. DeGrote told him that the ammunition bank would have to be eliminated that day. Prior to that Mr. Wuigk, general inspector supervisor in Building 105, told Mr. Thaller it would be necessary to eliminate the bank during Thaller's shift. Mr. Bolling, an assistant process inspector, told him the bank would have to be eliminated or he would lose his job. At about 3 p. m. Wuigk instructed Thaller to start shoving "the ammunition across", which Thaller understood to mean send it to Ordnance without visual inspection. Acting on these instructions the balance of the ammunition was sent to the Ordnance Department without receiving 100% visual inspection. Witness Betty Dearing testified to taking part in the inspection process, that she reported the irregularity of sending ammunition to the Ordnance Department without being visually inspected to William M. Hurley, the chief inspector of the defendant company. She further testified that at that time Mr. Hurley informed her inspection of ammunition was not a requirement and that it was done only as a courtesy to the Ordnance Department. In view of the emphasis laid on inspection in the production of ammunition and visual inspection at various periods during its production, and the reaction of some of the employees to the failure to inspect 100% visually on October 16th, it is our opinion that Miss Dearing is in error in her recollection of her conversation with Mr. Hurley.
Summarizing plaintiff's theory of the testimony on the acts relied on to show a right of recovery on this assignment, we quote from plaintiff's brief:
"The acts and conduct of the defendant, its officers, agents and employees as conclusively shown by the evidence herein clearly established the violation by the defendant of each of the first three clauses of Section 5438 [Sec. 231, 31 U.S.C.A.] These acts consist of:

* * * * * *
"(iv) The submission by defendant of ammunition to the Ordnance Department as Grade A which had not been inspected prior to submission as required by the contract specifications; * * *".
Paragraph (iv) of the summary must refer to the elimination of the bank on October 16, 1942. No claim is there made that the record shows any of this ammunition to be defective or if defective that any such defective ammunition passed to the Government. On page 67 of the brief it is argued that by the commission of the acts, including the one now under consideration, defendant "caused the plaintiff to accept lots of ammunition which it would not have otherwise accepted". So we construe plaintiff's position to be that by virtue of delivery of ammunition constituting the bank without 100% visual inspection, "defective ammunition thereby" was intermingled with every lot of ammunition described in the voucher covering that period.
The fact that some 700,000 rounds of ammunition was "passed" on October 16th in Building 105 in and of itself carries no notice to the plant manager that visual inspections were not being executed according to instructions. The regular force of inspectors on hand was twenty-nine. They inspected 346,940 cartridges or an average in excess of 11,000. Inspectors in other departments where there is no charge of irregularities handle approximately the same number of cartridges. Fifty additional inspectors were brought into the department to help eliminate the bank. Those brought into the department did not work the full shift and some may not have had sufficient experience to keep up with inspectors of the regular force. If 720,000 cartridges were handled it would leave 373,060 to be inspected by approximately fifty inspectors brought into the department as against 346,940 shells inspected by the regular force of twenty-nine inspectors. We think this is some evidence of an effort to inspect, also of the pressure under which the bank was moved.
As we read the results of the Ordnance inspection of ammunition submitted to it in eliminating the bank of October 16, 1942, they show the quality of the ammunition was not below the average for that period and the per cent of visual defects found was not in excess of the number of visual defects permitted under the specifications. Assuming, for the sake of argument, the *398 conduct of defendant's servants in removing the bank of ammunition constituted evidence of willful wrong, does it rise to that character of fraud required to sustain a claim under the Statute? To do so it must first be assumed, without any substantial evidence to support the assumption, that due to failure to inspect visually 100,000 to 125,000 rounds of ammunition, or even the whole of the bank, that defective ammunition was passed to Ordnance. Based on this inference, it must be inferred the Ordnance inspectors by their inspection of the ammunition failed to detect such defective ammunition. As a result Ordnance accepted the ammunition and it was delivered to plaintiff and became the subject of a claim, and was paid for under voucher covering the payment of fixed fees for the period from October 12, 1942 to November 8, 1942. There is no evidence from which it could be concluded that this ammunition in the course of production had not received all other inspections under defendant's system, and some of it may have received a visual inspection on some other day. Neither is there any evidence from which it could be concluded that any of the ammunition in this entire bank was defective beyond the amount that was to be expected and allowed in the usual operation of the plant.
We are unable to find from this record, the actions of the defendant's employees in moving this bank of ammunition show any attempt on their part to defraud the Government. It is hard to believe, had defendant intended to deceive the Government on this occasion it would have executed its plan in the open by a large number of employees who knew the regular procedure for handling ammunition, with apparently no effort made to hide precisely what was being done. Taking the operation of the plant as a background and the circumstances under which its manufacturing operations were being carried on, we are led to believe the motive for the October 16th activity was to speed up production under pressure exerted by the plaintiff to obtain delivery to meet a grave national emergency.
Therefore, under the pleading and the False Claims Statute we find there is an absence of proof that any of the ammunition was defective, that the defendant knew any of the ammunition, or had cause to believe any ammunition in the bank that passed to the plaintiff was defective. Under the pleading and the statute it is necessary the plaintiff trace, by substantial evidence, defective ammunition into the whole or part of the bank in question; also knowledge of such defective ammunition on the part of the defendant at the time of its delivery to the Ordnance Department, and that the Ordnance Department accepted such defective ammunition, and such defective ammunition was represented in a particular voucher with the knowledge of the defendant. Fraud grows out of dealings between parties under the False Claims Statute.
The weakness of plaintiff's case on this claim is further evident when we go to its argument under the heading of damages. There it is stated: "The standard by which damages are measured, when a wrong has been done, and the law gives a remedy, is that the compensation recoverable on account of the wrong shall be equal to the injury." Unless defective ammunition was passed to the Ordnance Department and accepted by them, and as a result sent to the packing department and the ammunition delivered to plaintiff, the plaintiff could sustain no "injury" thereby.

(b)
Subparagraph (b) charges: "On sundry occasions between May 1, 1942 and October 1943 the defendant submitted for acceptance by the United States .50 caliber ammunition as Grade A which had not passed the inspection requirements for Grade A. It had been agreed between the United States and defendant that certain types of ammunition would not be submitted for acceptance except as Grade B. The defendant nevertheless did cause the acceptance by the United States as Grade A of several hundred thousand rounds of ammunition, which could properly have been accepted only as Grade B, by removing *399 surreptitiously cards placed with boxes of Grade B ammunition and substituting therefor cards indicating that the ammunition was Grade A."[9]
A large segment of the record bears on this assignment. Plaintiff's answers to interrogatories stated the irregularities under this heading occurred in Buildings 104, 105 and 204, between May 1, 1942 and October 1943, and affected several hundred thousand rounds of ammunition. The activities of defendant's servants which are involved originate with Paul Thaller, who on July 1, 1942, was made general inspector for one shift in Building 105. The practices presently to be referred to followed instructions from Thaller. If he received authority to give these instructions from any higher authority, there is no substantial evidence to show it.
After Thaller became general inspector in Building 105 the practice was engaged in, at times, of upgrading ammunition from B to A either by changing markings on the cards (attached to the ammunition containers, i. e. tote boxes or skids), or destroying the B cards and substituting new A cards. Thaller gave instructions to his subordinates to effect this practice of changing B cards to A cards. In some cases the ammunition had been graded by the reinspect girls as B ammunition and was upgraded to A ammunition. In some cases skids of ammunition which had been rejected or downgraded by the Ordnance Department and returned to defendant was upgraded by substituting the cards and resubmitting to Ordnance for inspection by them as Grade A ammunition. In some instances skids of ammunition were taken from the defendant's final inspection department on the second floor to the loading department where the cards were changed. In some cases the skids, after the cards had been changed on the first floor, were put on conveyor belts and sent back upstairs. Skids which were thus put on conveyor belts would in the usual course pass through the gauge and weigh and final visual inspection operation. There is no evidence the ammunition so placed on conveyor belts did not follow the usual course of inspection thereafter. Some of the skids of ammunition which were taken to the first floor, where the cards were changed from B to A, were brought back to the second floor by elevator and placed with other lots for submission to Ordnance. An effort was made for two days, at least, to move the ammunition from the inspection department down to the first floor for the purpose of changing the cards from B to A and return it to the second floor and submit to Ordnance, without Ordnance inspectors learning of defendant's servants' actions in that regard. In other cases the cards were changed from B to A on the inspection floor in plain view of anyone in the department and with no effort to conceal from anyone. Some of the witnesses testified to changing or seeing the cards changed from B to A as early as May and June of 1942. These dates must be errors because Thaller, who gave the instructions which resulted in the change of cards, did not occupy a position to give such instructions until July, 1942. Thaller testified that they began changing cards in September of 1942 and continued for about three months, that there were periods of weeks during this time when no changes were made. He also testified that in his opinion the ammunition was Grade A and that he was doing no wrong in directing the card changes so that it could be submitted as Grade A ammunition.
Aside from the testimony of Septowski no effort was made to show what disposition was made by the Ordnance Department of ammunition which was submitted to them as Grade A by virtue of change of cards. The testimony of this witness indicates one weakness in plaintiff's case. Even though there were irregularities in the handling of ammunition by defendant's servants, and assume it was willful and wrong and would constitute a base for fraud, failure to trace to acceptance of the ammunition by the Ordnance Department *400 leaves the subject one of speculation in a vital particular. What action did the Ordnance Department take with respect to the ammunition? Did it accept or reject the ammunition? That Ordnance was conducting a visual inspection is indicated by the following excerpt from this witness' testimony:
"A. Well, on numerous occasions, what I am trying to explain to you is when I took them in there they in turn had the A card on them, then if they rejected them again to B card then in turn I had to put the new card on again. In other words, I went through the process of keeping moving those skids back in back through the Ordnance Department.

* * * * * *
"Q. Well, do you know what final disposition was made by Ordnance of any one of the something over 70 skids which were handled in the manner in which you have described, the final disposition made of it by Ordnance? A. Well, the only thing I can tell you when I brought them up there, in other words, when they put them in if they rejected them down then I regraded them and run them through again, I kept running through until they were all gone. That is the only thing I can tell you.

* * * * * *
A. Well, if Ordnance rejected them then they had their so-called stickers and stuff on them. I took them off, put them into fresh boxes and took them back up to Ordnance again.
"Q. Supposed Ordnance classed them as grade B; you wouldn't have anything more to do with them, would you? A. Yes, they would run them through again.
"Q. You mean Ordnance wouldn't accept them as grade B? A. They didn't accept them as grade B. In other words, they just kept pushing them back through."
Even though an inference may be discernible in this witness' testimony that the seventy skids of ammunition referred to by him were finally accepted by the Ordnance Department, in view of other testimony as to the manner in which the Ordnance Department conducted its inspections by firing and other tests which took some time, and the fact that this witness was not a regular employee of the final inspection or gauging and weighing department of defendant but was only called to work there occasionally during one shift, his conclusion that the ammunition was finally accepted by the Ordnance Department does not rise to substantial proof but is an opinion of the witness.
Many of the witnesses testifying on this assignment told of either changing cards or seeing the cards changed, without any explanation as to what had been done to the ammunition prior to the cards being changed. In a letter from the defendant to the Commanding Officer of the Ordnance Department in charge of inspection at defendant's plant, dated August 27, 1942, and approved by the Ordnance Department, appears this paragraph: "Inasmuch as quite a number of skids of ammunition which have been reworked by the contractor have been found to contain no defects whatsoever by the Ordnance Inspection Department, it is our recommendation that any skid of ammunition submitted as Grade "A" and down graded to "B" or rejected on gauging, can be reworked by the contractor and resubmitted to the Ordnance Inspection Department as Grade "A". This procedure shall be followed for one resubmission as Grade "A" only."
To what extent changing of cards resulted from this exchange of correspondence we are left to speculate and guess. The ammunition upgraded by changing cards may in some instances have been in conformity with this letter. This circumstance was not eliminated. Take the testimony of Mr. Septowski. His regular occupation was in the second visual inspection. On the occasions when he went to Thaller's department and moved ammunition to the Ordnance Department for inspection, on which cards had been changed from B to A, he testified, prior to having the skids that he was to move pointed out, he had never before seen the ammunition.
"Q. And therefore you don't know of your own personal knowledge what had been done to those skids before you took them out of the department and handled *401 them in the way that you have described? A. The only thing I can say to that is they had me take them downstairs and had me take and put these other cards on it."
Another phase of the testimony offered under this assignment was given by witness Becker. He testified that in April, while in Building 105, he was ordered by his superior, the general inspector for the building, to take "no letter" ammunition and spread it on skids of current-run ammunition. "No letter" ammunition is ammunition which does not bear the manufacturer's identification letter. We are asked to construe this testimony as showing that "no letter" ammunition was thus submitted "as Grade A ammunition". Again, the question is  what action did Ordnance inspectors take on this ammunition? Was it defective?
We find there is no substantial evidence that plaintiff was caused to accept any defective ammunition as the result of changing of B cards to A cards, or any of the irregularities specified under subparagraph (b) of paragraph 5 of the amended complaint, and therefore we find a failure of proof that any false claims could have been presented by defendant based on matters set forth in paragraph (b).
The testimony of Mr. Andereck is revealing on the character of inspection made by Ordnance. Defendant's numerous inspections during production should serve to reduce rejections by plaintiff through its Ordnance Department to a minimum and thereby expedite production. But Ordnance Department inspections were not of a perfunctory nature. Plaintiff did not depend upon defendant's inspections. It depended on Ordnance inspections. The Ordnance Department conducted such character of inspections of ammunition submitted to it by defendant as Ordnance considered necessary to determine that defendant was delivering ammunition in accordance with specifications. In Division (b) of plaintiff's appendix to its brief, comment is made on the resignation of James E. Westrich who was general inspector supervisor in Building 105. Here we find illustration of the effectiveness of the inspections made by the Ordnance inspectors. Production was being handicapped because of a large bank of defective ammunition which had accumulated. This resulted in Mr. Westrich's resignation. His successor was Edward J. Schaller. That the Ordnance Department inspections were responsible for a substantial proportion of the accumulation of defective cartridges is shown by the testimony of Walter C. Andereck, Chief Ordnance Inspector for 105, who testified to a conversation with Schaller, at about the time he became general inspector supervisor in Building 105, as follows:
"A. Mr. Schmidtke who was Mr. Schaller's immediate superior at that time, came to my office and wanted me to meet the new inspector in charge of the inspection in Building 105, and we went to Mr. Schaller's office which was formerly Jim Westrich's office; at that time I was introduced to Mr. Schaller, and it was more or less the usual introduction, and at that time Mr. Schmidtke left, I believe to go to 104. Mr. Schaller stated that we had been a little rough on Jim Westrich, that he wasn't getting 

* * * * * *
"A. That I had, the Ordnance department, that he had not been getting a Grade A ammunition, and if I would take a little easy on him and let him get some Grade A ammunition and some of that rejected ammunition passed, he was sure we could get together on dinners, drinks, women, and have quite a time.

* * * * * *
"* * * At that time I stated all that was necessary was get the ammunition within tolerance and he would get all the Grade A ammunition he desired."
The ultimate acceptance or rejections by Ordnance of the ammunition was based on the inspection of the finished cartridge by the Government inspector (Plaintiff's Exhibit 13):
"2. Inspection of cartridge components prior to assembly:
"(a) The Government inspector and his assistants shall be allowed access to those parts of the plant of the contractor where *402 work for the War Department is being performed at any time when such work is in progress, and shall be allowed to observe any and all processing operations on the ammunition covered by the detail specification.
"(b) Before the components are assembled into completed rounds and after such components have been drawn from stores and stock on hand, the Government inspector may, without interfering with production, assure himself in such manner as appears practicable that the components are suitable in all respects for assembly into satisfactory ammunition, according to the detail specification.
"(c) Components may be gaged and weighed frequently by the Government inspector for the purpose of determining that they are within the specified weight and dimension limits, and the contractor shall furnish adequate facilities, such as necessary floor space, tables, and benches for conducting this component inspection.
"(d) The purpose of this component inspection is to effect a check on previous component inspections made by the contractor and to detect obvious defects which might previously have been overlooked.
"(e) In making the examination described above, the Government inspector shall not, without valid reasons therefor, interfere with production.
"(f) The Government inspector will promptly notify the contractor of defects coming to his attention in any appreciable quantity which, in his opinion, would make the final acceptance of the material doubtful. Such action, however, is advisory only, and the ultimate acceptance or rejection of the ammunition will be based on the inspection of the finished cartridge by the Government inspector." (Emphasis added.)

(e)
Subparagraph (e) charges: "On sundry occasions between February 1, 1942 and October 1943 defendant did submit for acceptance by the United States .50 caliber ammunition which had been previously submitted and rejected, without causing the same to be reinspected as required, or after causing only random or spot checking to be performed, and did also submit ammunition which had been rejected by defendant's own inspectors, by surreptitiously placing quantities of such rejected ammunition on skids of cartridges which were being submitted to the United States for acceptance."
It is doubtful if this assignment charges fraud under the import of the False Claims Statute. It ends short of claiming acceptance by plaintiff of the ammunition described. The assignment only takes the ammunition to where it was "submitted" to the Ordnance Department of plaintiff for inspection. Without acceptance by the plaintiff the ammunition described could not have been included in any claim presented to plaintiff by defendant.
In answer to Interrogatory 39 plaintiff represents that there were "several million rounds of ammunition" rejected and resubmitted between February 1, 1942 and October 21, 1943, without proper inspection by the defendant. Does the evidence go further than the charge?
The Ordnance Department usually took only a token sample from each skid of ammunition received. This was subjected by Ordnance to visual, gauging and proof house inspection and test. The record leaves no room for doubt, many skids of ammunition were rejected by Ordnance as a result of their test. Specification (e) has to do solely with such rejected ammunition.
In the appendix to plaintiff's brief the testimony of thirteen witnesses is summarized. Between May of 1942 and January of 1943 some skids of ammunition which had been rejected were downgraded by Ordnance and returned to the defendant for further handling. Defendant on some occasions resubmitted this ammunition to Ordnance without 100% regauging or 100% revisual inspection. It was represented by defendant's employees, by use of notation on skid cards, to the Ordnance Department, that such ammunition had been 100% reinspected. This practice of so resubmitting rejected ammunition to the Ordnance Department took place while George Graef was a supervisor in Building 105 and also while Paul Thaller was a supervisor. The record does not show anyone, *403 having authority beyond the last two parties, authorized or approved the procedure.
The record is silent as to the reason why this ammunition was rejected by the Ordnance Department. The cause of rejection by the Ordnance Department in many cases determined the requirements, on manner of rehandling the ammunition by the defendant. Mr. Dillon Evers, a witness for the plaintiff, now a professor at Purdue University, was stationed at the United States Cartridge Company plant as a Captain in the Ordnance Department during the last war. He testified with respect to the handling of rejected ammunition by the defendant and the necessity of 100% inspection as follows:
"A. I believe that in part of the time, particularly in the early part, perhaps I should say the early part of the summer of '42, the cartridge company was permitted to reinspect rejected ammunition for the defect which appeared in the Ordnance sample; in other words, it was turned back to them and told, for example, this lot or skid of ammunition is rejected because we found so and so, and the company was then permitted to merely reinspect for that defect. I can not recall whether, for example, if we found a gauging defect, whether or not the company was required to reinspect for that particular defect plus visual inspecting the skid or not, but I do know that there were some short cuts.
"Q. In order to be  by short cuts you mean permissible short cuts? A. Permitted.

* * * * *
"Q. Now, is this true, Captain Evers, then, that during the fall we will say of 1942, in order to know just what the company was required to do with any particular skid of rejected ammunition you would first have to know the particular date, the reason for the rejection, probably the grade for which it had been originally submitted and probably the grade for which it was being resubmitted  would you need that information in order to be able to testify just exactly what the requirement was at any particular time? A. Yes, I would need that and some more, too, very likely.
"Q. And some more, too. So that if you were simply told that at some unnamed day in 1942 an unidentified skid of ammunition was taken from the Company's inspection area after once been sent back by Ordnance, and resubmitted to Ordnance without being one hundred percent revisual, perhaps, or without being one hundred percent regauged, or without some other procedure, you would have to have this other information which I have mentioned and perhaps some more in order to be able to testify whether that procedure was correct or whether it was a violation of the regulations and requirements?

* * * * *
"Q. But until you had at least this other information you couldn't say whether the handling of the skid which I have suggested to you was correct or incorrect? A. No, sir."
Plaintiff's brief presents no argument of substance on a theory to show acceptance of the ammunition under consideration, by the plaintiff through the Ordnance Department, nor that payment for the whole or any part of such ammunition forms the part of any claim paid by plaintiff to defendant.
We are not to be understood as declaring that this record does not raise a suspicion that defendant on occasion failed literally or substantially to meet either of the final inspection requirements on resubmitting Ordnance rejected ammunition and that in so failing its servants used deceptive methods. But a suspicion falls short of proof necessary to establish that such ammunition resubmitted was defective and was accepted by Ordnance when resubmitted to them; all of which is necessary to establish fraud in violation of the false claims statute.

(f)
Subparagraph (f) charges: "It had been understood and agreed by and between the United States and the defendant that starting in June 1943 no ammunition which had been previously rejected by the United States would be resubmitted except when accompanied by a certificate in writing by an agent of the defendant that the ammunition *404 mentioned or described in such certificate had been subjected to machine gauging and weighing after rejection and before resubmission. The defendant nevertheless, during the period from June to September 1943, in connection with the submission of .50 caliber ammunition, did make, use, or cause to be made or used, certificates which were false and contained to defendant's knowledge fraudulent or fictitious statements or entries, in that such certificates stated or certified falsely that lots of ammunition had been regauged and reweighed as agreed upon between the United States and defendant under the terms of said contract, when in fact such lots had not been regauged or reweighed."
We hold the same views as to sufficiency of the record to support assignment (f) as we expressed on assignments (a), (b) and (e).
While plaintiff's answers to interrogatories identified Buildings 104, 105 and 204 as the scene of the irregularities here complained of, only Building 105 is involved and one shift only in that building. During the months of June and July and August ammunition was rejected by the plaintiff through its Ordnance Department, and before this ammunition could be resubmitted to the Ordnance Department under rules then in effect, as understood by the operators of defendant, such ammunition was required to be subjected to machine gauging and weighing. At various times during this period such ammunition was returned to the Ordnance Department with a certificate to the effect that the ammunition accompanying the certificate had been machine gauged and weighed, and such representation was false and known by the servants of defendant making same to be false. It appears fairly certain that the ammunition in each instance where it had not been machine gauged and weighed was hand gauged and weighed. These conclusions we have reached with considerable difficulty. As to much of the period and facts relied on, there is confusion as to exactly what did take place and the details of how the ammunition was handled. This is to be expected, we feel, when the parties must rely upon the memories of witnesses as to detailed information about what took place seven or eight years prior to the trial.
The testimony of Kendell Welsh, called by the plaintiff, leaves the impression that where ammunition was hand gauged a previous machine gauge may have been relied upon or the cause of rejection determined the character of inspection.
"Q. Now, what were your instructions from your superior concerning the functions of the gauge and weigh department, relating to the ammunition  rejected ammunition returned to the company by the Ordnance Department?

* * * * *
"A. Well, if I am not mistaken, before the latter part of March or first of April in 1943, we just gauged the rejected ammunition for the defects.

* * * * *
"A. Just for one operation. Like they are head to shoulder, whatever it was, it was gauged for that one operation and submitted.

* * * * *
"A. And then in  I think it was around April in 1943, they required them to be hand gauged and rerun again on the gauge and weigh machines.

* * * * *
"Q. Did Mr. Held give you any other instructions concerning the handling of this Ordnance-rejected ammunition? A. Well, occasionally they would  we would hand gauge a skid a 100 per cent and would be submitted to Ordnance without having been re-run the last time on gauge and weigh.

* * * * *
"Q. I don't want to know what you did, but I want to know what Mr. Held instructed you to do. A. Well, whenever  well, we were just told to hand gauge them a 100 percent, and some of the skids we were told to submit to Ordnance without running them again through the gauge and weighing.

* * * * *
"Q. About how often would skids of ammunition be submitted during your shift, under these instructions? A. Well, there *405 were very few. I couldn't say just exactly how many.
"Q. Do you know approximately how many? A. Oh, out of 700 skids, I imagine there was probably  I don't know  I just rough estimate there might have been two or three a month.

* * * * *
"Q. Now, when these skids of rejected ammunition were returned to Ordnance, were they accompanied by a certificate? A. Well, they were after a certain time. There were not up until  I don't know  some time in June or July.
"Q. Did you  well, what was stated on those certificates? A. Well, it said it was a 100 per cent hand gauged and run through gauge and weigh.
"Q. A 100 per cent? A. Yes.

* * * * *
"A. You mean they had been re-run now through gauge and weigh? They had all been through once.

* * * * *
"A. Well, I knew  we knew a week or two ahead of time what kind of defect was coming through, because our general foreman was in contact with the other general foreman in the cases line, and also the assistant superintendent, and they knew what defect was running through, and they knew what to look for, and they knew what would be in it, if any defects were in it, and that was merely a consultation with the general foreman as to which, if any, would be submitted without being re-run maybe the second or third time with gauge and weigh." (Emphasis added.)
Further doubt is cast upon the details of these transactions through the exhibits introduced by the plaintiff to support them. Plaintiff's exhibits 90-1 through 90-56 were offered as representative of the type of certificates which were returned with the skids by the Ordnance Department. Shown these certificates, this witness did not say they were the certificates that accompanied the ammunition to the Ordnance Department, but answered: "Yes, these were rejected skids". Referring to these same exhibits Mr. Wuigk, a witness for the defendant, stated their use as follows:
"A. That slip was originated by me to give the inspection department the information that the production department had either gauged the rejected ammunition, or run the ammunition through the gauge and weigh machine.
"Q. This operation of hand gauging or running through gauge and weigh machine was an operation performed by the production department as distinguished from the inspection department? A. Yes, sir.

* * * * *
"Q. Did you establish the system of requiring these slips be sent out by employees in the production department? A. I established that in Building 105; that was exclusive at that time.
"Q. These slips were then given to employees in the inspection department? A. That slip followed the skid of ammunition into the inspection department, inspection table, and that was the notification to the supervisor that it was ready for visual inspection.
"Q. Then after they had received whatever visual inspection was required and was ready to be resubmitted to Ordnance, would there be a skid card submitted to Ordnance? A. There was a skid card submitted with every skid of ammunition that went into Ordnance."
There is also a difference in the recollection of plaintiff's witnesses as to the amount of ammunition handled under these circumstances. Welsh testified on the subject as follows:
"Q. About how often would skids of ammunition be submitted during your shift, under these instructions? A. Well, there were very few. I couldn't say just exactly how many.
"Q. Do you know approximately how many? A. Oh, out of 700 skids, I imagine there was probably  I don't know  I just rough estimate there might have been two or three a month."
Another witness, Joseph W. Blackwell, asked a reason for submitting ammunition to Ordnance with false certificates, testified:
*406 "A. Well, there was about 4,000,000 rounds of ammunition on the floor up there and just about no place to put it.
"Q. Well, now, is that why you did it? A. Well, I guess that is one reason."
Later the witness qualified the above answer by saying he presumed it was the reason he received orders to make false certificates from his superior and that it was not his reason. We get the impression, due to the press for production the employees handling the ammunition could not keep up with production flow with their inspections and also carry out the reinspection required on Ordnance rejected ammunition before it could be resubmitted. This was the testimony of plaintiff's witness, Ferdinand Louis Stukheil: "A. 1943? I spoke to him about the procedure that had to be followed  the way production was running at the time, we could not follow that procedure, because we would never keep with our production if we had to follow that procedure, so he stated to me: `Well, I don't care how you do it, just so that ammunition is taken care of.'"
As to quality of the ammunition, there is evidence defendant was meeting specifications. But by-passing inspections which they did not consider necessary. Stukheil testified: "A. Well, I started to follow the old procedure. I just would, if the skid was rejected back on scratches, why, I would not run it through the machines, because the machine would not throw them out anyway."
The amities of peace-time operation of a factory were given little consideration in the operation of the Plant. It was dominated by military personnel. Pressure was applied, and necessarily so, from the top to the lowest workman, in the operation of the Plant. There it had to stop; and at times he cut the requirements of the regular routine, and was careless, neglectful, and in some cases deceitful, in his conduct, to make the set requirements. These considerations cannot be ignored. Defendant cannot be entirely blamed for them, unless it knowingly authorized or approved a wrong that might lead to delivery of defective ammunition. There is nothing in the record on this assignment that evinces an intention even by the employees concerned to defraud the Government. The testimony for the Government on behalf of all the witnesses giving evidence on this charge was that either hand or machine gauge was used on the ammunition and that kind of gauging was used which the defects called for. There is no claim that any defective ammunition passed to the plaintiff because of the practice.

(g)
Subparagraph (g) charges: "It was also a part of the aforesaid fraudulent schemes that the weighing and gauging machines be set in such a way as to permit considerable variance from the desired dimensions or weights, and thus fail to throw out cartridges which varied to a greater extent than a maximum tolerance."
James L. Clontz worked for defendant approximately eleven days in Building 105 as adjuster of gauging and weighing machines. He testified that the machines were checked at the start of each shift by having "every adjustment on the machine insofar as the inspection was concerned, to see that it conformed to specifications we had been taught in the training school." On the use of gauges or dies out of tolerance, his testimony was: "A. Well, ordinarily they would be caught before too many were rejected like that, they would see that the machine was rejecting almost every cartridge, you know, I mean it wouldn't reject a few and accept one or two, rejecting almost every one being put through the machine. In that case, the chief adjuster or the acting foreman would come around and see if he could discover the machine was out of adjustment, you know, or something he could discover that I, as adjuster, had overlooked, and if he didn't discover that, why, he had some oversized gauges, tolerance gauges, that he would substitute for the regular subscribed tolerance gauges in the machine, and he as a practice as I recall it would come around, he and the chief adjuster, that is Mr. Stukheil, who was the acting foreman, would come around shortly after the shift had started if we were having trouble, and take out the prescribed *407 tolerance gauges and substitute these oversized gauges."
In the testimony of Laura Shy, who was a 100% visual inspection girl in Building 105, she tells of receiving cartridges from the gauge and weighing machine that had defects which should have been detected in the gauging and weighing machine, and going to Mr. Stukheil and requesting him to check the machine.
Again the question presents itself  did plaintiff accept any defective ammunition by reason of the change in tolerance of the weighing and gauging machines? This requirement of even a prima facie case plaintiff continues to ignore under the various specifications. We are prompted to make the observation that it must be with studied intent, since at the close of the case the Court specifically asked the parties to cover this phase of the case in their brief. Now under specification (g) we have a charge of probable malfunction of a machine. Assume a machine, or machines, was set to pass ammunition that was defective and not in accord with the specification  and this must be an assumption because the evidence does not support the conclusion. What became of the ammunition so produced? Did it ever reach the Ordnance Department for their inspection? There is no proof that it did.
By brief plaintiff claims a conspiracy on the part of defendant to avoid the inspection requirements in the contract. If there was conspiracy on the part of the defendant, it was most unusual  it would bring a machine inspector into the conspiracy who had only worked a few days, a complete stranger, and then would have a 100% inspector girl watching the output of the machine for defects. And she is the source of the Government's case on this point. Plaintiff's conspiracy theory is not aided by the testimony of Mr. Clontz. He was discharged because his machine was passing ammunition that was oversized and misshaped. The other witness called by plaintiff in connection with assignment (g) confined her testimony to discovery of cartridges on final inspection without powder, or an insufficient amount of powder, and that some time elapsed after reporting this condition before adjustments were made on the machines to correct the defect. This testimony lends weight to the conclusion that many defects may and did appear in ammunition during the process of manufacture which were discovered and rejected by defendant's inspections. This was the purpose of the inspection. The weighing and gauging machines by change of dies were set to permit passage by the machine of a cartridge with tolerances different from the prior set. There is no evidence that the result of changing the dies and tolerances resulted in acceptance by the machine of ammunition at variance with the specifications. There is no evidence to sustain a claim that any ammunition which may have been passed by the weighing and gauging machine as a result of change in dies and tolerance, even if defective, ever reached the Ordnance Department for their inspection and rejection or acceptance.
A different conclusion can only be reached by inferring that due to a change in dies in the gauging and weighing machine defective ammunition was produced, and then based on this inference to infer that subsequent inspections by defendant failed to detect the defect, resulting in delivery of the defective cartridges to Ordnance for acceptance; and, finally, based on these two inferences to infer that Ordnance did not reject the ammunition but accepted it.

(h)
Subparagraph (h) charges: "It was further a part of said fraudulent schemes and practices that production inspection requirements other than weight and gauge, final visual, and test firing were avoided in that on numerous occasions between February 1942 and October 1943 the defendant caused and permitted defective component parts of cartridges to flow into production and thereby become a part of the lots of ammunition which said defendant caused the United States to accept by reason of the fraudulent practices and subterfuges described in subparagraphs (a) to (g) of this paragraph (5)."
*408 Here plaintiff is undertaking to plead that it was caused to "accept" certain lots of ammunition delivered by defendant between February of 1942 and October of 1943 "by reason of the fraudulent practices" referred to.
Plaintiff's brief and appendix to brief make references to specific irregular acts. Some of the references are the subject of testimony previously discussed under prior specifications. By the present charge practices referred to in previous subparagraphs (a), (b), (e), (f) and (g) are here grouped, and thus collectively defendant is charged that by reason thereof plaintiff was caused to accept certain lots of defective ammunition. The grouping of the charges does not make a stronger case than when they are presented separately.
Some of the acts of defendant's servants on which the charge "that production inspection requirements other than the weigh and gauge, final visual, and test firing, were avoided" will serve to illustrate their general character. The head turn machine forms the head pocket and extractor groove of the case. On some occasions the head turn machine in Building 105 was not shut down promptly, and adjustments made on complaint by the operator that defective cases were coming from the machine. The defective cases went onto the conveyor belt at direction of a building foreman. A building foreman ordered a quantity of defective bullets delivered to the loading house. The same foreman avoided an inspection on bullets to determine if they had scratches, nicks, etc. The loading machine assembled the bullets and powder into the completed cartridge. On one shift in Building 105 a substantial quantity of cartridges which had received a light powder charge were permitted to pass on to the next step in production. Lumpy powder was furnished to the loading machines and used at the direction of the superintendent or foreman of the building. Primed cases, with certain defects, were marked "hot scrap". This classed it for destruction outside the building. Boxes of hot scrap were found in the loading department. Cartridges with mashed primers were found in the final inspection department, and a building foreman ordered them passed by the visual inspectors with the comment that the defect was not sufficient to cause rejection. The proper operation of the assembly machine called for tests to be made regularly as to weight of powder going into a shell. If a machine was found out of adjustment, it should be stopped and correct adjustment made. There were occasions when this rule was deviated from. On some occasions further tests were made to find if the machine was really out of adjustment before it was shut down. The product of the machine producing light powder weight cartridges was permitted at times to go into the line of production. The primer is inserted in the cartridge case in the primer insert department. Each case was required to have a vent hole. The primer was waterproofed. One of the tests of this department is a mercury test to determine if there are hidden cracks in the case. Also the case is inspected for defects such as nicks, dents, presence of flash holes, and other defects. A machine producing primers with any such defects should be stopped immediately and corrected. This is the final operation before the assembly of a cartridge. Primer cases were produced with defects in this department over a twenty-two day period. There were low primers, thick heads, and other defects. These were held up by the building inspector supervisor. What ultimately became of the defective primer cases the record does not develop. One inspection of cases was by a machine that caused the cases to rotate. The rotary machine should pass a maximum of 90 cases per minute for .50 caliber and 100 cases per minute for .30 caliber. The speed of some of the machines was increased by the use of tape on the pulley wheel. Who put the tape on the wheels is not in evidence. The defendant ordered this practice stopped.
There were irregular acts of similar classification in Buildings 102, 104 and 103, but the greater number was in Building 105. It is not necessary to go further in their description. While differing in detail they are all subject to the finding that in no instance if defective ammunition did *409 result is there proof, direct or circumstantial, of its acceptance by the plaintiff's Ordnance Department. In most instances the action complained of took place during the time a cartridge  and in many instances component parts of the cartridge  was passing through defendant's assembly line. There is no testimony from which it could be found, with any degree of certainty, that ammunition, if defective, was accepted on later tests made by defendant in its process of manufacture; or that such ammunition, if defective, and had passed defendant's inspections, was ever delivered to and accepted by the Ordnance Department of plaintiff.
Carelessness and failure of certain employees of defendant to perform their duties is evident. On the other hand, in some cases there was a difference of opinion between employees of defendant's inspection department and the production department as to whether or not the claims of defects by the inspection department were justified. Manufacture of ammunition is not an exact science by any means. There is a zone where honest differences in opinion in the manufacturing process can exist.
Plaintiff's case under this specification, which a large volume of the record was offered to support, fails to establish defendant was engaging in schemes and practices to deliver defective ammunition to plaintiff, and to receive compensation for it, or that there was a conspiracy to do so.
Referring to specifications (a), (b), (e), (f), (g) and (h), and the evidence offered in support of them, it appears plaintiff has adopted a theory of liability, based on construction of the contract between plaintiff and defendant, that it called for a certain specific character of inspection and process of manufacture by the defendant and that any deviation would be a violation of the contract and any cartridges accepted by plaintiff during the period that such deviation occurred would constitute a violation subjecting defendant to penalties under the false claims statute. It is our opinion that plaintiff has misconstrued the contract in the foregoing respect. The contract does not require any specific kind of inspection or process of manufacture by the defendant. The contract (Article I-F) required plaintiff to "maintain a satisfactory system of inspection, gaging and gage checking concurrent with manufacture, and no ordnance material shall be submitted for the Government inspector's approval which has not previously been inspected by agents of the Contractor and found to be up to the contract standard".
Defendant maintained a system of inspection which was subject to, and constantly was, under observation of plaintiff's representatives. There is no proof of any complaint at the time by plaintiff as to lack of a system or failure substantially to follow the system. Minor and specific changes were requested by the plaintiff. There is no proof they were not made. Isolated instances of submission of ammunition, which contained defects, to plaintiff for inspection, and acceptance, was not in accordance with specifications, but these instances do not constitute contract violations of a fraudulent nature where such action was due to carelessness, neglect or failure of defendant's employees to carry out their instructions in performance of their duties. With very few exceptions, it was the system of inspection that developed the factual situations which form the groundwork upon which plaintiff rests its case. Without a proper and efficient system of inspection (and that means a "satisfactory system"), the conduct complained of would not have become known. The high norm of the system of inspection is evident by the result it obtained.
We are unable to agree with plaintiff the conduct of defendant's employees in the acts relied on to show fraud entered into and destroyed the value of the inspection process in the Ordnance Department. It is true the Ordnance Department did not make a 100% inspection. The percentage of ammunition checked by the Ordnance Department was determined by them and we can only conclude that the determination was the result of their opinion as to what percentage of check was necessary to determine compliance or noncompliance with the specifications. By the *410 contract plaintiff told the defendant it was depending upon its test and not defendant's to determine whether the ammunition submitted complied with specifications.

(c) and (d)
Subparagraph (c) charges: "On sundry occasions between March and September 1942 the defendant did cause to be packed quantities of .30 caliber ammunition which had not been submitted to the United States for sampling and testing. This was accomplished by causing skids or boxes of ammunition to be removed from the inspection area to the packing area, and causing such ammunition to be packed as part of accepted lots."
Subparagraph (d) charges: "Between March and September 1942 defendant did cause to be packed quantities of .50 caliber ammunition which had been rejected by the United States or by defendant's own inspectors or which had not been submitted for approval by the United States. This was accomplished by placing quantities of such ammunition with lots which were being made ready for packing at times when the representatives of the United States had finished taking their samples or were temporarily absent from the place where the ammunition was stacked, and packing the same as part of accepted lots. In connection therewith, the powder lot numbers on cards accompanying rejected lots were altered to correspond falsely with powder lot numbers on the lots with which they were surreptitiously placed."
Specifications (c) and (d) we will consider together. While they allege different specific acts, in the two types of ammunition involved, the period in question is the same, and the final result of the acts, as charged, is the same.
Either of these charges, if sustained, would show defendant's employees deliberately by-passed tests by plaintiff to determine acceptance or rejection of ammunition by plaintiff. Inspection of all ammunition produced was a condition precedent to acceptance by plaintiff. There was no exception to the iron-clad contract condition. Negligence, carelessness and failure of employees of defendant to perform their duties on the assembly line or in delivery, standing alone, in the particulars we have discussed, falls short of proof necessary to sustain plaintiff's charge of presenting false claims because of the definite requirement that ammunition must run the hazard of acceptance or rejection by plaintiff, based on plaintiff's inspection and none other. When the Ordnance inspection is avoided by defendant's employees, all ammunition so handled loses the Government's stamp of approval. Negligence, carelessness and failure of defendant's employees confined to the assembly line or delivery only, lacks proof of intent to lead plaintiff into accepting defective ammunition or ammunition that may be defective. If defendant's employees by any method or device carrying with it an intent to do so, and therefore not including accident avoided plaintiff's inspection, it must be presumed they intended the natural consequences of their act, that is, such employees intended to deprive plaintiff of its absolute right of inspection prior to acceptance of ammunition produced by the defendant. There was wide knowledge on the part of defendant's employees of the right and necessity of the Ordnance Department inspecting ammunition prior to acceptance by plaintiff. We recall no employee, however low his place in defendant's organization, who did not evidence knowledge of plaintiff's right to inspect and defendant's obligation to deliver all ammunition to plaintiff for inspection prior to delivery.
The last operation of defendant in its production of ammunition was packing of ammunition, accepted by the Ordnance Department, for delivery to the shipping department. The packing operation was performed in an area near the final inspection in the gauge and weigh department. After acceptance of ammunition by the Ordnance Department notice to pack as to the lots accepted were issued to the defendant. The ammunition when packed was transferred by conveyor to the Ordnance shipping department. Lots of ammunition were usually shipped on the date or date following the packing.
The first witness presented to sustain charges (c) and (d) was Edward J. Schaller. He was general inspector supervisor *411 in Building 105. His testimony relates principally to the packing of "no letter" ammunition, during a period when the Ordnance Department was taking its samples from ammunition in the packing department. There was no substantial evidence the packing of "no letter" ammunition, prior to taking of samples by the Ordnance Department, violated an agreement with the Ordnance Department at the time referred to in this witness' testimony. Schaller and Herbert E. Schmidtke, an assistant process inspector, worked out a plan with reference to the "no letter" ammunition, described by Schmidtke as follows: "During March or April, 1942, there were about 200,000 rounds of `No letter' ammunition passed and packed in building 105 in the following manner: Schaller and I both realized that at that time the U. S. Ordnance Department would not accept lots of `No letter' ammunition or lots of ammunition containing large amounts of `No letter' cartridges, but that they would accept lots of ammunition containing small quantities of such `No letter' cartridges. We therefore agreed that this `No letter' ammunition should be passed by placing two or three tote boxes of it in each skid of ammunition. Although no mathematical computation was made, in a general way I agreed that the quantity of `No letter' ammunition which was to be placed in each skid should be such that if the Ordnance Department were to take their samples in their usual manner, not enough `No letter' cartridges would be contained in the samples to cause the rejection of the lot."
Commenting on the character of ammunition classed as "no letter" ammunition, he further testified: "In effect, with this no-lettered ammunition I desire to state that in my opinion it was perfectly good ammunition, inasmuch as its only defect was that it bore no identification or identification letters on the heads of cartridges, furthermore, the powder contained in these no-lettered cartridges had been previously tested by the United States Ordnance Department, in effect, with previous lots, in which the same powder lot had been used. Therefore, I felt no harm had been done in altering the tote box cards above described."
Mr. Becker, another witness on this subject, confirms that part of the "no letter" ammunition was inserted in the regular run prior to Ordnance taking samples. We quote:
"Q. Can you recall Mr. Schaller giving Mr. Graef any orders concerning packing of so-called `no- letter' ammunition? A. Yes, sir.
"Q. About when were those orders given by Mr. Schaller? Can you recall the date? A. That was some time in April of 1942, right after I came to work there.
"Q. And what were Mr. Schaller's orders to Mr. Graef concerning the disposition of this `No letter' ammunition? A. He told him that he should take it and spread it about on the skids, so it would go into Ordnance with the regular run of ammunition."
The specifications during this period permitted, both for grade A and grade B ammunition, a certain allowable percentage of visible defects. Ordnance had ruled that "no letter" ammunition represented ammunition with a visible defect. The conduct of Schmidtke and Schaller would be excused by defendant  that they were distributing "no letter" ammunition, a little at a time, among the vast quantity submitted to Ordnance, "so that the percentage that would appear in the Ordnance sampling would be within the percentage of such defects permitted by the specifications".
But there is evidence that during this period, when Ordnance was getting its samples from the packing department, Ordnance inspection was willfully cancelled out and the evidence on this score preponderates in favor of the plaintiff. The testimony of Charles E. Hamilton gives specific dates, quantities and lot numbers. The conduct of defendant's employees in packing rejected ammunition with good ammunition stirred this employee's sense of wrong-doing, with the result a diary was kept by him which is the source of the dates, quantities and lot numbers given eight years after the transaction. This witness was apparently an eccentric person. He was sensitive about what he observed. But he stands unimpeached except for one *412 or two errors in the record kept by him, and as to that it could well be he was without knowledge of the facts that caused the error in his diary. The dates upon which defective ammunition was packed and the quantities and lot numbers on which Ordnance inspection was voided on it, as given by this witness, is as follows:

 Date Quantity Lot
April 9, 1942 10,000 A P 50 cal 7299
April 11, 1942 200,000 A P 50 cal 7230
April 9, 1942 50,000 50 cal. tracer 7013
April 13, 1942 over 156,000 7230
April 18, 1942 10,800 A P 50 cal 7318
April 20, 1942 5,400 A P 7320
April 21, 1942 10,000 A P 7323 and 7322
April 22, 1942 5,000 A P 7324, 7325,
 7326
April 24, 1942 21,600 7327-26
April 25, 1942, 15,000 A P 50 cal 7331
 and 7332
April 27, 1942 over 20,000 7020, 7326,
 7333, 7334
May 2, 1942 20,000 7346 and 7347
May 7, 1942 7038
May 9, 1942 99,750 7062
May 9, 1942 99,750 7062, 7424
 200,000 7339
May 20, 1942 7453, 7456-58
May 21, 1942 180 50 cal A P 7533-34
June 4, 1942 7072, 7073, 7074
 199,750 7579
July 7, 1942 198,775 7903, 7907
July 8, 1942 198,100 7912
July 14, 1942 7285, 7372, 7587
July 18, 1942 7376, 7381
July 22, 1942 100,000 D 7937, 7386,
 7926, 7937
August 21 XXXX-XXXX
 & XXXX-XXXX
August 26, 1942 1,800,000 XXXX-XXXX
 & XXXX-XXXX, 8801
May 25, 1942 7541, 7070, XXXX-XXXX
July 3, 1942, 180,000 7775

Witness Arnold testified that on three or four occasions, when the packing department "ran out" of ammunition and did not have enough "to fill out" a lot, under instructions from Schaller he obtained rejected ammunition from an area in which the Ordnance rejected ammunition was stored, and caused it to be packed, and that his instructions were "not to let the Ordnance inspector see what ammunition goes into the packing process". "Five to seven thousand" rounds of ammunition were involved on each occasion.
Ronald W. May, working in the packing department in Building 105 in April of 1942, as a supervisor under Gus E. Brown, an assistant superintendent of the building, said that Schaller pointed out some 60,000 rounds of "no letter" ammunition with instructions that it be packed. May thereupon consulted with his superior, Mr. Brown, about carrying out the instructions for packing of the "no letter" ammunition because it wasn't "a regular procedure". Mr. Brown told the witness that he (May) was not "an inspector" and that he should pack "whatever the inspection department gave" him to pack. May carried out his instructions. As to avoiding detection by the Ordnance Department, the witness testified:
"A. Well, it was suggested that we had these regular run of ammunition, skids of ammunition, in front of our driers, we put a skid of this no letter ammunition across the aisle and after the inspector took their samples why we set one or two tote boxes of ammunition on the drier and run them through.
"Q. Was that done then while the Ordnance  after the Ordnance inspector had taken his samples and had gone on down to where the chests were going down the chute? A. Yes, sir.
"Q. In other words, as I understand it, these chests of no letter ammunition were loaded in with regular run of ammunition? A. That is correct."
Guy C. Pender, whose work was to set ammunition on the table in the packing department, received orders to obtain ammunition with a reject tag on it and take it to the packing department where it was handled as described in the testimony of May. He testified that this rejected ammunition was "sometimes [packed] with the Grade A". About one skid a day was handled in this way over a period of "several weeks". He also received orders to watch for the Ordnance inspectors and not to move any *413 ammunition into the packing department from the rejected area while Ordnance inspectors were present. On cross-examination this witness was indefinite as to the quantity of ammunition handled by him in this way, but no reference was made in cross examination to the fact that he did handle ammunition as testified in his direct examination.
George J. Graef, who was a supervisor in final cartridge inspection from March until October 1942, in Building 105, was the only witness to give an explanation of what was meant by shortage in lots of ammunition and how it occurred: "Well, when the packing department was running packing samples it would automatically cause a lot of ammunition to be short maybe 100 cartridges or 250 cartridges, whatever it might be short, maybe in the process of handling cartridges in the packing department the move man or move girl or packing girl back there dropped a carton or a tote box of ammunition which had to be throwed out and couldn't be picked up off the floor and packed. Well, at the end of the lot it would be short ammunition to make it 100,000 or 200,000, whatever the lot amounted to."
He testified to packing rejected ammunition "after the Ordnance inspectors had pulled their samples and it was just run right in like the ordinary current run of ammunition was being packed". He recalled four times when this happened and six to eight tote boxes were needed at a time to fill in  "on a couple of occasions I seen them pull in  well, it was two skids, one skid at a time". There are ten thousand rounds of ammunition to a skid. Thus far the record describes transactions in Building 105 only and indicates that it was confined to one shift.
We now go to testimony bearing on activities of a similar character that transpired in Building 102. Apparently only one shift is involved, and the prime mover of the procedure was a foreman of the packing department by the name of Cohen.
Otto A. Skinner, an inspector supervisor in Building 102 in the gauge and weigh department, testifying by deposition, stated that commencing in May of 1942 "at least five times" he knew "where cartridges were sent to the packing department "without Ordnance inspection". There was a shortage, and he took cartridges out of the regular production and sent them to the packing department at the request of Cohen and also the assistant superintendent of the building, Mr. Drier. These movements took place at a time when Ordnance had changed its inspection in taking samples from the packing room, and ammunition was being submitted to Ordnance after final visual inspection by defendant. The following is from Skinner's cross examination:
"Q. Now, the next sentence, continuing after the one I just quoted, says: `Said cartridges had been hand-gauged after rejection by the machines and were ready for submission to Ordnance'. Is that correct? A. That's right.
"Q. And the next sentence is: `Thereafter, on one occasion about two weeks later, the assistant building superintendent, whose name I now recall to be Drier, asked me to send about 10 or 12 tote boxes direct to packing.' Is that correct? A. That is approximately right, yes."
There was corroborative testimony given by other witnesses on these two specifications of fraud. We refer to Alvin A. McFarland, Clarence G. Bothe, Raymond Riley, and John Q. Grubbs. Grubbs testified that on the second occasion when he was requested to move ammunition back to the packing department, "and not let the Ordnance man see me", he refused to carry out the order and later, with three other employees, reported the matter "to Ordnance". Ordnance representatives sought to identify the boxes containing the ammunition, but it was too late. They "had gone on through packing". Witness Grubbs rebelled about conditions in the packing department. He told the supervisor "that it wasn't supposed to be done that way". The witness also testified about the packing of defective ammunition in machine gun belts after the ammunition had been rejected by Ordnance and laid aside.
*414 "A. Well, they had fellows there to work on then, tried to straighten them out. Then the inspector, the Federal inspector, Ordnance workers, would reject them and they put them over on a table.
"Q. Now, what would happen to them after that if you know? A. Well, they would pick different ones to go over and get them when the inspectors would have their backs turned, they would get an arm full back on the table, and to shove the ones they pulled out back in and go ahead and pack them.
"Q. They would be packed? A. Yes, sir.
"Q. You mean taken from this table on which they were laid after being rejected? A. Yes, sir."
Because of the activities about which the witness testified, he resigned his position.
We have not included in our summary all of the witnesses whose testimony plaintiff cites in support of the two assignments under consideration. Those not named we pass without comment other than to state that in our judgment their testimony is without probative value on the present subject.
As to actions in Building 102, we have Otto Skinner, an inspector supervisor, admitting that he authorized and had knowledge of these transactions. While Cohen denied making any such request, or knowledge of such transactions, it is our opinion the weight of the evidence sustains the conclusion that Cohen did make such request and had knowledge of such conduct. Bothe admitted that such transaction did occur.
As to the acts complained of in Building 102, we find no substantial evidence to sustain the conclusion that authority for, or knowledge of the transactions went beyond foremen or other employees having supervisory capacity in Building 102.
As to Building 105, defendant by brief states that authority for handling of the "no letter" ammunition "admittedly came from Schaller, general inspector supervisor, and Schmidtke, assistant process inspector". Schaller testified that all orders generally came down from Hurley and DeGrote as the normal channel of communication, and he also testified he received orders from them with respect to getting "rid of no letter ammunition". There is no evidence that either Mr. Hurley or DeGrote gave instructions to avoid Ordnance inspection, or had knowledge of an inspection by the Ordnance Department being avoided, or that attempts were being made to deceive the Ordnance Department. There was testimony of receipt of instructions on avoidance of Ordnance inspection from James M. Baker, Building superintendent, and M. A. Sharp, general foreman, and G. E. Brown, assistant building superintendent. Baker denied the charges. Sharp and Brown did not testify.
We conclude that the authority and knowledge of such transactions as to Building 105 did not go beyond those having supervisional authority limited to the building.
We conclude defendant's employees did, between March and September, 1942, willfully cause to be packed and accepted by plaintiff .30 and .50 caliber ammunition, knowing that such ammunition had not been inspected by plaintiff through its Ordnance inspectors and accepted as complying with the specifications.
There is no evidence to sustain a finding that ammunition on which Ordnance inspection was avoided was defective in the sense that it would not function properly. In this sense "no letter" ammunition is not defective.
That defendant may or may not have reaped a financial benefit on ammunition paid for as a result of avoiding Ordnance inspection, neither excuses nor condemns the conduct of the defendant's employees. Depriving plaintiff of its right of inspection was not a technical violation of established procedure. It went to the very heart of the processes of manufacture and acceptance of ammunition. Depriving the Ordnance Department of inspection of ammunition placed the ammunition in that category where it was uncertain what its condition was and whether it was in occordance with specifications.
If the knowledge of defendant's employees involved in these acts can be *415 imputed to defendant corporation and those who presented vouchers for payment of the ammunition, then presentation of pay vouchers therefor represented a false claim. They would be presented with imputed knowledge of falsity that the contract requirements had been met as to Ordnance inspection and approval. Such claims would be subject to the penalty of the false claims statute, if the contract terms do not relieve defendant.

VIII.
Defendant urges the liability limitation provisions of the contract as a complete defense to the charges of plaintiff. The limitation of liability provision appears in the contract under four different divisions. In Title I, Article I-B, paragraph 9, page 7, it concerns indemnity to the end that defendant be held harmless against any loss, expense, damage or liability of any kind whatsoever arising out of or in connection with the performance of the work under the contract. In Title II, Article II-A, paragraph 1 (g), page 10, it concerns the subject of reimbursement by plaintiff to defendant of all losses sustained by defendant. In Title II, Article II-A, paragraph 4, page 13, it refers to trade discounts, etc., and exempts defendant from liability for failure to take them. And in Title III, Article III-F, paragraph 5, page 22, liability is limited for failure to perform the contract. Personal failure of the corporate officers or other representatives of defendant having supervision and direction of the operations of the plant as a whole, to exercise good faith or that degree of care which they normally exercise in the conduct of the contractor's business, is in each the condition precedent to imposing liability.
These contract provisions were inserted at the instance and on the insistence of Mr. Olin, President of Western. Plaintiff approached him on the subject of construction and operation of the Plant. The Plant had not then reached blueprint stage, nor had its location been determined. The parties negotiated the contract, and in doing so dealt at arms length. Neither was compelled to contract or accept the contract on the terms set forth. There is no claim of failure on the part of either party to understand the terms of the contract. We assume each of the parties in negotiating the contract acted fairly and in good faith. In determining purpose and intent of the parties as to the interpretation that should be given to these liability limitation provisions, we take the language in its accepted meaning. The contract is not vague. Consider the surrounding circumstances. Defendant was undertaking a promotional obligation of immense size. Thousands of untrained workers would be necessary to carry on the operation. The plant must be built, equipped and placed in operation under the pressing necessity of effecting early and continuous production of ammunition in large quantities to meet a national emergency. Mr. Olin was a man experienced in the manufacture of ammunition. He must have envisaged there would be manifold problems presented in the requirement that untrained labor in large numbers be used. That he at least tried to limit defendant's liability for the conduct of this multitude of employees, who at that time were unknown, does not appear strange or unreasonable. Plaintiff is now asking for a judgment for $214,878,725.12, based on defendant's liability for each and every act of each and every employee involved in the activities complained of, regardless of the origin or authority for the conduct of such employees. While defendant may not have foreseen this character of claim, or any specific character of claim for that matter, Mr. Olin doubtless saw a possibility of claims coextensive with the enormity of the proposed plant and its operation.
Plaintiff argues the limitation of liability provisions were not intended by the parties to cover liability for fraud in submission of a false claim by an employee. We cannot read such an exception into the contract under its terms. There are no exceptions in the sections in Titles I and III. We cannot rewrite the contract. The contract does not enumerate specifically acts for which liability is limited in the *416 two titles. It uses broad terms. We construe it to cover liability for any "failures" in manufacture and delivery of ammunition under the contract. That is what it says in plain English. Recovery is now sought on the theory of "failure" to comply with the contract. A "failure" of such nature and extent as to constitute fraud in law and liability under the false claim statute. If there is no "failure" in the manner stated, there can be no recovery.
Plaintiff further contends the liability limitation provisions are against public policy. Plaintiff cites no authority so holding. We find none. The contract was made by a responsible officer of the plaintiff. He had authority to act. Would plaintiff imply this officer entered into a contract with defendant that would in execution, as to a provision repeated four times, do injury to the public good? The contracting officer's authority has not been questioned. Like the contracting officer, we see nothing in the contract of such an offensive nature as to place it in the class of agreements void because against public policy. Wherein does it do injury to the public good? Defendant was given no unbridled authority to proceed under the contract. The contract is replete with provisions for plaintiff to retain control over the operation of the plant and its personnel, even though they are designated as defendant's employees. Plaintiff could cancel the contract at will or could cause the discharge of any employee. The manner in which the work was done must meet plaintiff's approval. Defendant was not relieved of all liability by the contract. Liability was conditioned.
Plaintiff cites authority to the effect that one cannot contract against his own fraudulent acts because that is against public policy. We agree. The case of Abercrombie v. United Light and Power Company, D.C., 7 F.Supp. 530, is typical of this line of cases. There the Court held that provision in the mortgage agreement that the bondholders would have no recourse against the shareholders personally was void as against public policy. The suit was to recover dividends illegally paid to the shareholders. The issue here is whether defendant corporation may contract limiting liability for the fraud of its servants where it deals at arms length with the other party to the contract. The limitation of liability provisions do not release defendant of liability for fraud, even when committed by its employees. The contract conditioned such and all liability under the contract. The contract places a greater burden of proof on plaintiff than would be the case but for the limitation of liability provisions. Under the contract liability arises when loss is due to personal failure of either the officers of defendant corporation or its agent having supervision and direction of the operation of the plant as a whole, to exercise good faith or that degree of care which they normally exercise in the conduct of defendant's business. Fraud of an employee of defendant, of the lowest rank, would fasten liability on defendant if it resulted from failure, either of defendant's officers or agents having supervision and direction of the operation of the plant as a whole, to exercise good faith or that degree of care which they normally exercise in the conduct of defendant's business. Conversely  Absent such failure liability does not attach if the contract means what it says and is legal.
In the case of Browning v. Fidelity Trust Co., 3 Cir., 250 F. 321, terms of a trust indenture with a liability provision was at issue. It provided, the trustee could execute releases when the mortgagor was not in default. There was a clause that the trustee would not be liable, absent bad faith or gross negligence of the trustee. Bondholders brought suit against the trustee for breach of trust for executing releases for the mortgagor when it was in default on interest payments. Previous to the execution of these releases by the trust officer of the defendant, the bondholders had twice requested interest payment, but were refused by the banking department of the defendant because the mortgagor was in default. In holding for the defendant the Court held that while the corporate trustee had imputed knowledge *417 that the mortgagor was in default through its agents in the banking department, the evidence only established the trust officer was negligent in failing to inquire as to the financial status of the mortgagor before executing the releases, and therefore absent actual knowledge there was no bad faith and consequently the defendant was not liable under the terms of the trust indenture.
The case of Hazzard v. Chase National Bank, 159 Misc. 57, 287 N.Y.S. 541, is a similar holding. The trust instrument contained a clause relieving the trustee from liability for acts of its agents except where there was gross negligence or bad faith shown on the part of the trustee. In finding for the defendant the Court based its finding on the conclusion that there was no evidence of gross negligence or bad faith shown. In both the Browning and Chase Bank cases it was held, the rule of imputed knowledge did not apply in that it was not sufficient to overcome the limitation of liability clause because of absence of proof of bad faith or gross negligence. We think the facts in this case present a stronger case to sustain the terms of the contract on limitation of liability than in the Browning case and the Chase Bank case. The two cases mentioned were based on breach of trust where all that was necessary to fix liability, absent the liability limitation provisions, was the lack of ordinary care. In the present case liability is based upon fraud, and intent of the defendant is a necessary element of the offense charged. If limitation of liability clauses are sustained where negligence only need be shown, I think it follows that there is a better reason why they should be sustained where intent is an element of the offense and is sought to be proved through imputed or fictional knowledge. In the two cases cited responsibility was limited to a showing of bad faith or gross negligence on the part of the corporate trustee whereas in the instant case liability is conditioned on the failure of the corporate officers and certain agents to exercise "good faith" or that "degree of care" which they normally exercise in the conduct of the contractor's business. Restatement of Agency, Section 260, reads: "A principal may, by contract with another, relieve himself of liability in deceit for prior or subsequent frauds of an agent to such other."
The writers state the theory upon which this rule is based, that if by contract the principal relieves himself from liability for the statements and acts of his agent, then the party with whom the principal deals is put on notice that the agent's authority is limited and should not be relied on.
Liability based on imputed knowledge is urged by plaintiff, but we conclude that the use of the word "personal" takes from the case that question. By use of the word "personal", actual knowledge on the part of the officers or agents having authority and supervision of the operation of the plant as a whole is a necessary part of the proof for plaintiff to make his case under the contract.
We conclude the contract should be enforced according to its terms, including the limitation of liability provision.

IX.
What is meant by the language "* * * except to the extent that such failure * * * is due to the personal failure * * * of * * * representatives of the Contractor having supervision and direction of the operation of the Plant as a whole * * *". We are urged by plaintiff to hold that "Plant as a whole" means each manufacturing unit of the plant, such as Building 105, for example. Plaintiff's argument is answered by the terms of the contract. Page 4 of the contract in effect defines what is meant by the term "Plant": "Said Plant shall include parts manufacturing and loading buildings, powder storage area separate from manufacturing and loading units and removed from populous area, administration buildings, training school, magazines, shops * * * and other buildings necessary or appropriate for a plant of the approximate capacity aforesaid, with storage buildings in connection with the manufacturing and loading units adequate for about one (1) day's supply of incoming powder and twenty (20) days' supply of other materials and *418 about two (2) days' production of finished product." (Emphasis added.)

X.
There can be no argument on the meaning of the language "corporate officers" of the defendant. Plaintiff would enlarge on the contract meaning, in our opinion, as to who are covered by the language "representatives of the Contractor having supervision and direction of the operation of the Plant as a whole" by urging the inclusion of such employees as Schaller, Wuigk, Thaller, Smith, Rudolff, Cohen, McCormick, Baker, Brown, Bohn, and others with like or similar supervisional authority. None of these had authority beyond inspection or production activities in a single building, and in some cases only one shift in the building. Then there is another group which plaintiff would include, such as Mr. Hurley, Mr. DeGrote, and Mr. Rogers. Mr. Hurley had authority over all inspection processes but there his supervision ended. Mr. DeGrote had similar authority. Mr. Rogers had authority over production and inspection activities, but none over engineering, production control and other departments in the plant. The only testimony, direct or circumstantial, establishing that anyone had direction and supervision of the operations of the plant as a whole was given by Mr. Bassett:
"Q. Now, Mr. Bassett, you have already testified that you did have general authority and supervision over the plant as a whole, and calling your attention to this chart, I see in this top box, at the top of the chart, two names, A. R. Kelso and G. L. Dawson, each with the title of Assistant General Manager. A. That is correct; at that time those gentlemen occupied those positions.
"Q. There were some changes in those titles later on, which I am not concerned with. A. There were some changes later.
"Q. What authority and what right of supervision and authority over the plant as a whole did either of those two gentlemen have? A. I had the General Manager's office divided. Mr. Kelso at that time, concerned himself largely with production and with production personnel, and Mr. Dawson concerned himself largely with schedules, tool procurement program. When it was necessary to put emphasis on those parts of the work, there was always one of us at the plant or available to the plant, in charge, and if I was away, those two gentlemen, either one of them had the same authority for the general management of the plant as I had, and we shared that load."
It is our conclusion that Mr. Bassett, and Mr. Kelso and Mr. Dawson as his assistants, come within the terms of the liability limitation provision of the contract, as having supervision or control over the plant as a whole, and there is no substantial evidence upon which this list of three names can be broadened.

XI.
Can the finding of fraud in Division VII (c) and (d) be traced to defendant's officers or the agents specified, by evidence of a character that will meet the following rule: Fraud is never presumed but must be proved. Jones v. Simpson, 116 U. S. 609, 6 S.Ct. 538, 29 L.Ed. 742; Baumgartner v. United States, 8 Cir., 138 F.2d 29. The cases hold more than that the mere weight or preponderance of evidence is required. The evidence must be clear, unequivocal and convincing. Lackawanna Pants Mfg. Co. v. Wiseman, 6 Cir., 133 F. 2d 482; Tucker v. Traylor Engineering & Mfg. Co., 10 Cir., 48 F.2d 783. While proof of fraud may be accomplished by circumstantial evidence, fraud may not be proved by building inference on inference. Tucker v. Traylor Engineering & Mfg. Co., supra.

XII.
Plaintiff would meet the contract provisions by showing failure on the part of Mr. Bassett; that he was informed from time to time of failure on the part of various employees to perform their duties in accordance with the contract; that he "became aware" of the resignation of James E. Westrich because of his refusal to permit defective component parts to go into the manufacturing process; that he received "complaints of the activities of Mr. Schaller" and "numerous other complaints of irregularities" of employees; that he *419 knew of the contents of confidential reports "from early in the operation of the plant" and particularly the report made by Charles E. Hamilton listing irregular practices; that he "received through the Commanding Officer a number of reports relating to malfunction experience in use of ammunition manufacturing"; and that he "read the articles published in the St. Louis Star Times" relating to certain practices in the plant; and that "he was advised by John M. Olin, President, concerning complaints of General James Kirk". By a like process plaintiff would convict John M. Olin, President of the defendant corporation, of fraud because he "received reports of weekly meetings held by Mr. Bassett and members of his staff", and he "attended 20% to 30% of such staff meetings" and was "aware of the conditions described" in the newspaper items, and was "advised of a number of conditions and practices existing" at the plant which were criticized by General Kirk. Based on this character of reasoning plaintiff draws the conclusion, each of the corporate officers and representatives did have complete or advance knowledge of each and every fraudulent practice engaged in. We cannot acquiesce in plaintiff's conclusion. Knowledge of a failure, wrong-doing, or negligence after commission of the act is quite different from proof of participation in commission under the facts of this case. With employees in excess of thirty thousand much of the time, over three eight hour shifts, we think it would have been an industrial miracle if there had been no failure, no wrong-doing, no negligence, on the part of employees, considering the type of employee and nature of the work. The contract recognizes: "While the Contractor shall make every reasonable effort to manufacture Ammunition conforming to the specifications referred to herein it is recognized that variances therefrom are unavoidable * * *".
As to whether the general manager and officers of defendant exercised good faith or that degree of care which they normally exercised in the conduct of defendant's business, the only evidence of comparison of operation of the Ordnance plant with like plants comes from the report of the Ordnance Inquiry Board (defendant's Exhibit 39). This report, made by representatives of plaintiff, concluded by saying that the operation of the plant was no better nor worse than the operation of other munition plants. Plaintiff made no effort to compare the operation of the plant by defendant with like operation in other plants, nor to develop, in any manner, failure of the general manager and officers to exercise good faith or that degree of care which they normally exercised in the conduct of their own business.
Going to the charge that Mr. Bassett had knowledge that Mr. Westrich resigned rather than permit defective parts to pass into production, there is no substantial evidence that Mr. Bassett was aware of this fact, if it was a fact. Mr. Westrich did address his letter of resignation to Mr. Bassett, but the contents of the letter are not in evidence. We find nothing unusual in Mr. Bassett holding staff meetings and making reports on the staff meetings to Mr. Olin. There is no evidence that any fraudulent schemes or devices were discussed at these meetings, nor any irregular practices authorized or approved, directly or indirectly. No reference in the report of the Board of Inquiry suggests fraud on the part of any employee of the defendant. Some practices were criticized. Mr. Olin called them to the attention of Mr. Bassett, which impresses the Court as a normal proceeding, and there is no evidence that Mr. Bassett did not in good faith undertake to correct them.
Going specifically to the finding which would constitute fraud under Division VII of this memorandum, plaintiff refers only to the witness C. E. Hamilton, who kept a diary regarding instances of packing defective ammunition, and charges that Mr. Bassett received knowledge of this complaint and diary. Mr. Hamilton although requested, refused to give names of those who were guilty of offenses so they could be investigated. Mr. Bassett, learning of the general tenor of the Hamilton complaint, reported it to the Commanding Officer of plaintiff.
*420 Plaintiff argues that Mr. Hurley and Mr. DeGrote ordered deviations from the inspection process and the packing of "no letter" ammunition by giving instructions to that effect to Mr. Schmidtke. Plaintiff's brief states that "Schmidtke testified as a witness for the defendant that such `deviations' came down to him `as an order' from Mr. Hurley and Mr. DeGrote". It is our opinion that the record does not justify this conclusion. Specifically witness Schmidtke testified: "Any deviations from the written specifications were given to me by Mr. DeGrote or Mr. Hurley, who, in turn, would work this out with the Ordnance Department."
In accordance with this answer it was the testimony of Mr. Schmidtke that in disposing of the "no letter" ammunition they were attempting to spread it on a percentage basis with other ammunition that would meet approval of the Ordnance Department, and that their mixing "no letter" ammunition with other ammunition was prior to taking samples by the Ordnance Department.
No effort was made and no claim is made by plaintiff that W. L. Schulte, or any person who had any part in presentation of the claims, knew, or had reason to know, that any claim was not correct and justly due defendant. There was affirmative testimony as to their lack of knowledge.
It is hard to visualize operations of this vast plant several years after it closed, based on courtroom testimony  an incident here and another there, different departments, different dates, and different employees. Statements that may have been made facetiously are now recorded a solemn declaration of wrong-doing. In analyzing the testimony under the various assignments we find the acts complained of were those of employees in the lower levels, beyond which there were none to receive orders. The Government's case is, so far as those employees in higher brackets may be concerned in the irregular conduct, principally if not entirely confined to knowledge of the event after it transpired. So a real question arises  just what was the attitude of those in authority, whether or not having plant-wide supervision, toward the conduct relied on by plaintiff for a recovery? What effort was made in operation of the plant to use that care and good faith defendant would use in operating defendant's own plant? A large group of inter-office communications was offered by defendant. They were made during the time and record many of the occurrences and acts complained of. They were made in the usual course of business. They are revealing as reflecting a picture of the plant operations that adds much to an understanding of the situation that actually existed, the problems encountered and the attitude of the management toward them. Because of the significance we attach to them in this respect, although it lengthens this memorandum, we comment on them in some detail.
Defendant's Exhibit 338 is a folder containing a number of statements written by employees at the time of the plant operation. Most of the statements are by supervisory employees. They bear no signs of preconcerted plan on the part of the defendant to develop self-serving records. There was no objection on that ground. This exhibit further reflects that the personnel was constantly changing. That there were deviations from the specifications and problems of defective ammunition constantly presented is evidenced throughout the memoranda contained in this exhibit. The organization of the plant was not perfect. The production of the plant was not perfect.
E. L. King, Building 205, details the duties of a general inspector. Defendant not only had general inspectors, but assistant general inspectors, roving inspectors, reinspectors, as well as original inspectors. A number of visual defects were referred to in the testimony, supposed to be detected during the course of one or more of the inspections. Referring to defendant's exhibit 340 (a weekly report of quality as found by Ordnance, dated May 26, 1943, covering the period May 18th to May 25th), we find on the second page of the report 43 separate kinds of defects listed as having been found, in addition to 14 different kinds of gauging defects found *421 which are listed on the first page. Inspection stands out as a major problem in production. M. O. Hubbard (Exhibit 338), in listing his duties, devotes five paragraphs to such subjects as checking components of machines to see that they are running within specifications, discussing problems of "unsatisfactory conditions", checking or contacting Ordinance three times each day "to see what defects are causing trouble". C. J. Ivie speaks of high and low primers and ascertaining machines that are responsible for that condition and what disposition is made of defective ammunition. R. W. McClanahan speaks of checking the weight girls, checking correct powder weight; adjustments that are made when the powder weight is beyond the limit allowed; checking the scrap "to see that no good ones are being scrapped"; checking rejected skids from Ordnance so as to know what operations are needed to cut down poor quality. He checks the reinspect girls and if he finds "cartridges are being scrapped that are passable or vice versa" he sees that the reinspect girls are properly instructed. He states that many times it is necessary for him to see the foreman "concerning components being run out of specifications". Charles R. Merton refers to his duties when leaks occur in packing cases. W. W. McCaughen, assistant general inspector, refers to his duties when components are being manufactured out of specifications, "there are times when machines have to be shut down", and sometimes it is necessary to take this matter up with the general foreman or superintendent "to see that proper adjustments are made". H. Miller, a final cartridge supervisor, refers to decisions pertaining to the grade of A or B ammunition and his duty to see that "different grades of ammunition do not become mixed". Thomas Meyer, an assistant general inspector, keeps posted on the engineering department's specifications "so that any arguments that might arise between manufacturing's foreman and inspection's supervisors can easily be settled". C. E. Monteith, an assistant general inspector, states that "The operations having had the most trouble are the ones I visit first". He tries for cooperation for the purpose of having "the quality of components above par and the scrap down to a minimum". R. L. Rogers, general inspector, makes "final decisions" in cases where a question or doubt of quality may arise. Harold J. Stevenson, a roving inspector, lists among his duties checking for "bad profile, overall length, long and short, scratches and dents on cases and bullets" etc. Where defects are found material is held up "until machine is adjusted then they are released or if too bad they are scrap". G. F. Cromwell, inspector supervisor, states his duties where he finds "a man having trouble getting a machine adjusted". John Slaner speaks of "defects caused by loading machines" and checking to see that no "B ammunition [goes] into A [and inspectors are not] throwing any good ammunition into B".
Exhibit 54, dated January 20, 1947, is a memorandum entitled "explanatory note", from the Office of the chief of Ordnance. It refers to visual inspection standards issued by that office for use of Ordnance inspectors. Among other things the explanatory note says that the purpose of the previous publication on visual inspection standards is to assist the Ordnance inspector in arriving at "reasonably uniform classification", and "Most types of defects are capable of innumerable variations", and "The defect classification `permissible' merely means that it is permitted in the official sample without penalty. * * * A lot of small arms ammunition containing an unusual or unnecessary prevalence of `permissible' defects may not be rejected because of the presence of such defects but such an incident probably would be the subject of a complaint to the manufacturer". And, referring to major defects, it says, "In a few instances defects have been classified as `major' because their presence in the manufacturer's process is relatively inexcusable if ordinary care is used to prevent their occurrence in submitted ammunition." In closing the explanatory note asserts "Mass production methods are not capable of 100% freedom from defects. The illustrations of the brochure are intended to be applied to the *422 defects which may be found in the official sample despite the efforts of the manufacturer to prevent their occurrence." Exhibit 96 is a copy of a memorandum from the Ordnance Department as to operation of gauging and weighing machines and recites the requirement of constant check by hand gauging and regauging of rejected work in a special machine "for which the maximum and minimum gauges are made to a larger tolerance than the work machine gauges but still within the acceptance limits". Exhibit 22 is minutes of meeting of the defendant attended by two captains from the Ordnance Department, and contains this line  "Mr. Hurley stated that that ammunition which was rejected for a gage defect would be re-gaged and re-visualed. Ammunition which was rejected for a visual defect would simply be re-visualed before resubmission." The minutes also recite that the Ordnance Department was informed "a few skids of cartridges with points more blunt than allowed by the specifications were being accumulated. It was decided to segregate cartridges with blunt points and submit them as a lot and put them into grade `BMG'.", as of December 29, 1942. Exhibit 23 is minutes of a meeting of certain supervisory employees of defendant on January 12, 1943, with representatives of the War Department present, and among other things recites, "It was stated that the contractor would be required to write a letter if he wanted to submit a skid for the fourth time. Exhibit 39, submitted without objection, is a copy of a report of the Board of Inquiry conducted at defendant's plant in January, 1943. On page 12 of the report we find  "It is also known to the Board that the management recommended that all ammunition using cases made from 68-32 brass be classed as `Grade B' ammunition. Any subsequent temporary classification of this ammunition as `Class A' was done as an act of the Ordnance Department, based on acceptance firing tests as specifically directed." Exhibit 25 is minutes of a plant meeting on January 26, 1943, with representatives of the Ordnance Department. It contains a paragraph that "Contractor stated that in Building 202 they had 100 to 200 thousand cartridges with loose bullets and that for some reason the amount had built up until there were a million rounds in the lot. He suggested that steps be taken to find out on whose orders the additional rounds were placed in the same category." There is a further paragraph to the effect that "Contractor stated that there were four skids of caliber .50 ammunition in Building 105 with 1942 head stamps that had been rejected three times. He stated that he would submit a letter requesting Ordnance's permission to regauge. Exhibit 99 is a letter signed by DeGrote, for circulation among certain supervisory employees, and recites that "a very high percentage of our ammunition lots pass ballistic tests as Grade A, but are graded B in gauging, and in many instances fail even to make Grade B on the first test, resulting in the entire lot being regauged." A directive was issued  this condition must be corrected in the operation where the various defects are produced and sets forth directions for finding the defects.
Exhibit 43 is on the subject of expediting the manufacture of aircraft ammunition  it will require a concentrated effort on the part of all supervisors and each inspector is to be informed in this respect. "By this we do not mean that we are to change the standards of quality nor take any drastic steps to set out every minor defect; however, we do want to be certain that every cartridge which would be considered a Visual or Gaging defect be rejected before presentation to the Ordnance Department for acceptance." Exhibit 21 is copy of minutes of a meeting of defendant with Ordnance represented by Captain Vesely and Lt. Albiani, which took place regarding a certain lot of ammunition with "considerable wrinkles in the mouth of the cartridges. It was mentioned that this lot was an accumulation of two or three months of cartridges of such type and were submitted as Grade B. Captain Vesely said that he would check this lot immediately and make recommendations." Exhibit 8 covers a reprimand of one of the workers because "he has cartridges with defective bullets".
*423 Exhibit 98 is a letter signed by Hurley on the subject of misfires and recites "We are of the opinion that an accurate check on detectors is not being made on all shifts, if so it is not being reported when machines are found where detectors are not working properly. It is also our opinion that certain batch and control tests going to the Ballistic Department are still not being inspected and handled thru the proper channels. * * * Another recommendation is; that a general investigation regarding the manner in which primer Inserting Machines Detectors are being checked be made at once, as it is important that cases with no flash-holes be eliminated". Exhibit 93 requests every effort be made to eliminate tracer cartridges with no paint identification on the bullet tip, based on a report from the General Superintendent. Exhibit 90 refers to a primer with a double anvil having been found. "It is requested that you take immediate steps to tighten up on all inspection methods of both Primers as well as primed cases to eliminate this condition. * * * From all appearances no inspection is made on primed cases which are used for drop tests". Exhibit 89 refers to bullets with scratches, that considerable trouble with bullets of this type had been occurring for some time. Those to whom the communication was addressed were requested to correct the condition. Exhibit 88 is on the subject of "an excessive amount of scaly metal in Caliber .50" cases. This brought a series of procedural directions from Mr. Storms. Exhibit 87 directs certain employees "to load into cartridges the accumulated lot of so-called blunt point ball bullets, which you have estimated to be approximately 100,000". They were to be kept separate and submitted as a small lot as Grade B and Ordnance advised on their submission. Exhibit 85 refers to defective flash holes because of "not being pierced properly, and sometimes not being pierced at all". This condition brought forth certain procedure which it was believed would result in it being "impossible for a case that has not been pierced to get by into Loading". Exhibit 84 refers to a thirty caliber cartridge found in the gauging sample. It had scaly metal and could not "possibly pass the bullet inspection and the final cartridge inspection". This sample was passed to "everybody connected with Bullets or Cartridges from Movemen on up", and signatures appear on the exhibit as having seen the sample and comments were asked for on "just how a bullet of this type should ever be found in an Ammunition Lot". Exhibit 66 refers to anvils with a blunt point on the crown. These were to be shown all roving inspectors "so that they will know these types of defects as it is very unusual".
Exhibit 65 refers to high scrap percentage on a certain lot of ammunition. It is dated April 1, 1942, signed by W. C. Marks, and recites  "This is merely an example of pure negligence and not checking the job. This condition can no longer exist and make certain that it does not happen again". Exhibit 64 is a letter signed by the same party complaining about the manner in which a check is kept with reference to sample deliveries, advising of certain tests that should be made, and commenting "The .50 cal. tracer is causing a lot of trouble by splitting the necks of the cases as they are inserted." Exhibit 56 is a letter from the War Department asknowledging receipt of notice that certain shipping cartons which have been furnished the defendant "would cause tarnishing of the cartridges".
Exhibit 239, dated December 11, 1942, mentions use of "68-32" brass, that use of this brass will require a great deal of attention and supervision and that all inspectors must be on the alert for "cracked heads which we anticipate from this 68 metal". Exhibit 240, dated December 31, 1942, directs that if percentages of defects are running against specifications, "the machines must be stopped and adjusted". Exhibit 242 ordered tape on certain inspection pulleys be removed in order that the speed of machines not be increased. Exhibit 243, dated January 16, 1943, directs that there be no release in material that was held on account of refusal to shut machines down. Exhibit 260 states that supervisors in Final Inspection are not following procedures in regard to signing cards on ammunition returned from the Ordnance Department. Exhibit *424 277 reveals considerable trouble with primers not being sensitive enough and the reason. Exhibit 278 is on the subject of eye examination of the visual inspectors. Exhibit 280 contains a copy of a letter from the War Department that ammunition was being received in combat zones in badly corroded condition with the result that the Army Air Force had refused to accept ammunition packed by "present methods". This resulted in new packing specifications. Exhibit 285 refers to Charles Hamilton and his diary. Defendant's Intelligence Officer considered the diary detrimental to the war effort as well as the production effort until it was placed in "safe hands". Date October 1942. Exhibit 201 refers to moving ammunition to Building 205 where it was unpacked and reseated on a hand machine. The movement was from Buildings 104 and 105. Exhibit 203 evidences as of October 1942 failure to advise all parties concerned in Building 105 regarding the running of an experimental lot of tracer cartridges, which run was a deviation from standard procedure. Exhibit 207 indicates there were six major inspection operations, namely Case Manufacturing, Bullet Manufacturing and Bullet Visual, 1st Visual Inspection, 2nd Visual Inspection and Case Gauge, Primer Inserting and Loading and Final Inspection, and as of January 12, 1943, there were six more available to check the departments. This letter also indicates that upon check being made on machines it was "found practically every job to date running out of specifications". Exhibit 235 in regard to tying down the rejecting arm of the case gauge machine to reduce number of rejects; also bending the trip lever "that trips the steel ball which in turn rejects the case" for the same purpose. There had been a siege for some weeks in keeping the correct discs for overall length in machines for a 24-hour period. The adjusters were of the opinion that the amount of rejects would be less by making the machine fit the cartridge case rather than the case fit the machine.
Exhibit 47 authorizes acceptance as Grade A ammunition "if stretched cases do not exceed 10 per cent". Exhibit 68 is a letter by the Chief Inspectors to all roving inspectors, roving inspector supervisors, assistant general inspectors, general inspectors, and general inspector supervisors, admonishing those in inspection department to read the process inspection manual, and "If he finds that these instructions are not being followed or can not for some reason be followed, it is his duty to notify his immediate superior of these conditions". Exhibit 75 advises of an agreement with the Ordnance Department to the effect, "We have been given the privilege of regaging a rejected skid of Grade `A' ammunition and resubmitting the skid as Grade `A'" under certain conditions, or if "the Production Department desire, they may submit the rejected skids as Grade `B' without regaging". Exhibit 94 refers to a misunderstanding by employees of both plaintiff and defendant "on the proper standard to apply to cartridges placed in the head to shoulder gage".
The correspondence of Wuigk is revealing on the subject of operational difficulties and problems both on production and personnel. See Defendant's Exhibits 257, 253, 225, 247, 236, 221, 227, 226, 229, 230, 228, 232, 233, and 231.
During the period involved defendant repeatedly acknowledged defects of ammunition of numerous kinds. No effort to conceal the circumstances was made, that in some cases they were due to carelessness and neglect of employees not qualified to perform their duties, and in other cases to defective material received from outside sources. It is apparent defendant was faced with a continuing problem as to defects in ammunition, negligence and carelessness of employees and to keep sufficient employees to perform the contract.
Exhibit 172 reflects a criticism when ammunition was down-graded for reasons other than defects of ammunition, and the writer of the memorandum states  "we are led to believe that it is the desire of this Organization to produce all the Grade `A' ammunition possible". Exhibit 195 is a complaint of the high percentage of rejected tracers and the writer concluded that it was the result "of negligence on the part of someone in our Final Inspection Area." *425 Exhibit 193 is on the subject of "considerable trouble * * in the Taper and Plug Department" and the writer of the memorandum is inquiring why a "whole truck full of components could be run before the inspector noticed" the defects on the neck and shoulder of the cases. Exhibit 192 evidences some impatience of certain employees as follows: "For the past two weeks I have been trying to drive home to you fellows the importance of Scrap Reports". And ends by this sentence, "I expect no alibis for the condition of these two reports as in my opinion it is purely negligence". Exhibit 189 is on the subject of cases with "No Flash Hole", and how such defective cases will get by "unless everyone concerned is watchful". Reference is made to a machine that was being repaired and failure of the workman to isolate defective ammunition coming out of the machine during repairs. We find this comment  "The adjuster said he knew they were there and would have taken care of them himself, but under the pressing conditions these fellows work a great deal of the time  it would have been very easy for him to have finished the job  turned the machine off and rushed off to another machine." Exhibit 187 refers to a controversy "we have experienced in the past due to negligence in identifying the boxes", and refers to "another epidemic of mixed machine numbers and erasures on the Identification Cards of ammunition submitted to the Ordnance Department". Exhibit 188 refers to troubles in getting ammunition rejected by Ordnance resubmitted in the manner directed. Exhibit 183 is on the subject of "considerable trouble" in Building 204 with "Head Thickness and Primer Seating Depth". Extra inspectors were detailed to ascertain the source of this trouble. Exhibit 180 refers to trouble on June 8, 1942 in the Primer Inserting. The cause was found to be that the washing equipment broke down, and the "Heading Department continued to run cases which were improperly cleaned." This memorandum recites further, "It seems to be the policy of the Production Department to operate regardless of existing conditions, and let the components come out as they may". Reference is made to finding oil in the bottom of a truck with sawdust in it. Upon this condition being brought to attention of one of the supervisory employees, "he explained that he had cautioned his movemen and adjusters time and again regarding just such things as that. Schaeffer explained that the only difference between his movemen and a mule was that you could put a bridle on a mule. I know that I cautioned one man at least six times about dumping cartridges from one box into another and then threatened to fire him before he realized the significance of his act."
Exhibit 178 reflects difficulty in getting operators in Final Inspection to completely rotate shells, and that difficulty resulted from some of the girls wearing heavy gloves when inspecting shells. Exhibit 177 refers to scrapped cartridges from the gauge and weigh department being in the wrong location, and difficulty experienced in that connection. Exhibit 176 reflects trouble with a reinspect girl in confusing different kinds of cartridges "in the same carton", as well as "two very badly mashed primers". The writer termed this condition "an inexcusable offense, and more especially so since it was done by a reinspect girl." It was ordered that the person responsible for this condition "should be taken off the job." Exhibit 175 is on the same subject and reflects failure of the inspection personnel to perform their duties. Exhibit 174 refers to the failure to comply with rules as to where different kinds of ammunition are to be placed. Exhibit 173 reflects a "controversy between the manufacturing and the inspection departments regarding the scrapping of good ammunition". The exhibit also reflects a shortage of employees in the inspection department. Exhibit 162 is a daily report and starts by reference to "considerable difficulty with the Brass on .50 Caliber Case * * *. This is Bridgeport Brass" and resulted in a large amount of scaly and laminated metal. Exhibit 161 refers to blunt bullets and a procedure for inspection and submission as a separate lot to Ordnance. Exhibit 159 refers to a quantity of shells having bullets with a slight ring. The letter gave permission to load these bullets. Exhibit 157 was a War *426 Department circular that "several contractors have manufactured cartridges which deviate" from standard specifications and drawings. The circular states that the deviations were apparently made "in an attempt to simplify manufacture or improve design." The purpose of the circular is to call for compliance with the specifications except that any manufacturer may apply for permission to deviate. Exhibit 153 is on the subject of dents being hammered out of cases. Exhibit 150 refers to sending employees to the proof house to witness the firing of various types of ammunition in order to make the supervisor and inspection personnel more competent. Exhibit 146 is a complaint about the pull test machines and refers to a roving inspector abusing one of the machines. Exhibit 141 refers to an article in the St. Louis Star Times of December 3, 1942, regarding indictment of inspectors for irregularities. The letter states: "If you find anyone in the organization who willfully contributes to one bad round of ammunition getting to the Ordnance Department, I would like to have you take steps to discharge the employee immediately."
Exhibit 135 refers to "several lots of ammunition" being rejected because the powder was not held to correct weight. Exhibit 127 refers to failure on the part of the 100% inspectors in certain instances. Exhibit 122 is on the subject of oil "on the inside of the shell case or tracer jacket". This was described as a "serious situation". Exhibit 188 resulted from split cases being encountered on Mercury cracking test. This resulted in a change in the anneal specifications. A "special warning should be sent out to all inspectors advising them of this condition, cautioning them to watch specifically for Low Pull Test on the Caliber .50A P Cartridge loading job". Exhibit 117 tells of "considerable trouble with loose bullets and low pull test". Exhibit 113, dated January 19, 1942, states that "As of Saturday, January 17, Building No. 104 has been completely cleared of all questionable components and ammunition which were moved to Building No. 105" for reinspection and proper disposition. Exhibit 106 reveals, as of January 21, 1943, that the Ordnance Department was planting defective ammunition in the test samples in order to check the efficiency of the gauge girls. This procedure was referred to as "slightly off the beam". Exhibit 104 calls for all gauges in use of the manufacturing areas "to be replaced as soon as possible with completely reworked gauges regardless of apparent condition". This exhibit, as of March 15, 1943, says because they were having trouble "steps are being taken" to discourage the forcing of gauges. Exhibit 101 refers, as of February 6, 1942, to visual and gauging defects found by the Ordnance Department on final inspection and says arrangements were made with the Ordnance Department whereby these defects would "be used as a means of instructing all of our inspectors, both male and female, on the kind of defects they are allowing to be passed * * * Special effort must be put forth to eliminate all defects at once."
Exhibit 169 is general inspection rules, without date, containing a paragraph that "No inspector shall have the right to digress from specifications without having the authorization of the Chief Inspector or his appointee. Then this paragraph  "An inspector must, at all times, bear in mind the fact that we are entering into the new industry, equipped with new machinery and run by new men. This creates an inspection problem, the solution to which can only be rigid and continuous inspecting".
The interplant correspondence shows repeated comparison of production of the various units and shifts within the unit and workers on the various shifts. Even if this was without intent to create a competitive spirit to cause employees to press for increased production that result should have been expected.
Exhibit 312 of April 6, 1943, shows a comparison in four buildings of skids gauged and returned from Ordnance. Exhibit 214 shows the same thing as of April 20, 1943. This exhibit was addressed to Mr. Wuigk and called attention to an increase in his unit in skids on which defects were found. He was told, "It is imperative that you take the necessary action to improve *427 this condition. Exhibit 215 is on the same subject and bears the date April 13, 1943. Exhibit 302 is a comparison also of four building units and refers to a certain type of defect. This exhibit is of further interest as showing a deviation between buildings in manner of handling certain defects. Exhibit 292 instructs that the supervisor of 100% visual inspection "must also place a list showing production for the previous shift which he supervised and the quantity inspected by each girl so that all operators can see how their production compares with the rest of the operators on the same job and the same shift. Exhibit 254 calls attention to an improvement in one of the buildings in loading shells and suggests that other buildings consider doing the same.
While this plant was operating, and even after the Ordnance Board of Inquiry report, the Federal Bureau of Investigation's activities, the article in the St. Louis Star-Times, plaintiff was generous in its commendations. Exhibit 53 is a letter from the War Department dated August 16, 1943, to the effect that in the last phase of the "Tunisian Campaign approximately thirty-five P-40 type fighters fired a total of 25,000 rounds of .50 caliber ammunition in the attacks on the German transport airplanes, as a result of which approximately 72 enemy airplanes were destroyed, without a single machine gun stoppage." Congratulations were offered to defendant based on this report. Exhibit 97, dated February 16, 1944, contains a tabulation of misfires during 1943 at the defendant plant. It states that "the St. Louis Ordnance Plant .50 Caliber results indicate fewer misfires in the primers manufactured than would be encountered in those manufactured by Frankford Arsenal." Exhibit 62 is a letter, dated April 26, 1945, signed by one of the Ordnance inspectors who was leaving the defendant's plant, and expressing thanks "for the fine cooperation they have always" received from defendant. Exhibit 59 is a similar letter from another Ordnance officer leaving the defendant plant. Likewise Exhibits 58 and 55. Exhibit 3 is a letter from the War Department, dated January 1, 1943, expressing appreciation for the efforts of defendant and states their delivery of ammunition is a "notable achievement". Exhibit 2 is to the same effect. Exhibit 61 is a commendatory letter from the Army Service Forces, dated November 20, 1944. Exhibit 42 thanks the defendant for the preparation of the training manual.
In these exhibits we refer only to a few of a vast file. They are defendant's selections from the files. We have referred only to a small number of those offered. Plaintiff had access to the files. The conclusion seems obvious that defendant has made no effort to hide or conceal failures on the part of its employees. Almost every act complained of by plaintiff is reflected in the files. The tape on the pulley is in Exhibit 242; the Hamilton diary is in Exhibit 285; the changing of dies is in Exhibit 96; the forcing of ammunition in gauges is in Exhibit 104; the oil in case is in Exhibit 180. There are many others, all set forth in cold type, bearing the imprint of solemn admissions by defendant. We think this record evidences a constant effort by management to meet the Government requirements and to operate an efficient plant but under very difficult conditions. To find evidence of fraud or conspiracy to defraud, or intent to present a false claim, would require branding as a sham the countless declarations of the management employees of defendant. We must read into those declarations conclusions of fraud directly contrary to their evident spirit and purpose. This we must do when there is not the slightest evidence discernible by any process of reasoning why any of these employees should desire to cheat the Government, or motive for the defendant to do so. Defendant was paid for every round of ammunition delivered. It was paid for all loss due to ammunition found defective, discarded or junked. It was delivering millions of rounds daily. That it would try to cheat on the small percentage of ammunition involved in plaintiff's charges, compared with the whole of delivery, taxes the imagination. Especially is this true when we find defendant reducing the burden of the complaint to its written records and making them available to plaintiff and introducing many of them in this trial.
*428 These exhibits have the ring of genuineness. If they are not then defendant, who by this record is without previous charges of crime or criminal experience, has contrived a masterful plot dry of recompense. It has used countless strangers to execute the scheme in the broad, clear light of continuous examination and inspection by the Government. It put one set of employees to check another on the specific acts of charged wrong-doing, and it kept records of those acts. It violated every rule by which criminals usually execute such a crime as here charged by plaintiff. We repeat, the record looks regular. If they are, then they show good faith, admissions of errors, mistakes, carelessness, negligence (Exhibit 65) and failure in specific instances, followed by energetic effort to correct the trouble, error and failure and prevent its recurrence. If defendant operated the plant as plaintiff would now have this Court find, to defraud the Government, based on facts known to plaintiff at the time, then plaintiff, in the simple exercise of a public duty, should have cancelled the contract. On the contrary, during the Plant's operation, plaintiff's representatives, a number of whom knew many of the facts now relied on to show fraud, commended defendant on its performance under the contract. There is a difference in the Government's attitude, viewing defendant's efforts to perform at the time, under circumstances then prevailing, and singling out specific transactions seven or eight years after the event. We can only account for such a paradox by the present failure of plaintiff to consider all the facts and circumstances that bear on the events. This, to the extent possible, we have endeavored to do.
It is our conclusion the plaintiff has failed to sustain its burden of proof. This record fails to present substantial evidence there was personal failure on the part of the corporate officers of defendant, or defendant's agent or agents having supervision and direction of the operations of the plant as a whole, to exercise good faith or that degree of care which they normally exercise in the conduct of defendant's business, so that such failure resulted in fraud in the presentation to the plaintiff of a false claim under the False Claims Statute.
If additional findings of fact and conclusions of law are desired by either party, they may be submitted.
NOTES
[1] Herein referred to as Western.
[2] 1948 Revised Criminal Code, 18 U.S.C. A. § 371.
[3] 1948 Revised Criminal Code, 18 U.S.C. A. § 2154.
[4] Workmen on an hourly basis.
[5] Workmen on a salary basis.
[6] "It is the understanding of the parties hereto, and the intention of this contract, that all work, including the handling of funds, under this Title I is to be performed at the expense and risk of the Government and that the Government shall indemnify and hold the Contractor harmless against any loss, expense, damage or liability of any kind whatsoever arising out of or in connection with the performance of the work under this Title I, except to the extent that such loss, expense, damage or liability is due to the personal failure on the part of the corporate officers of the Contractor or of other representatives of the Contractor having supervision and direction of the operation of the Plant as a whole, to exercise good faith or that degree of care which they normally exercise in the conduct of the Contractor's business."
[7] "2. Fixed-fees as listed below for operation of the Plant which fees shall constitute completion compensation for the Contractor's services under this Title I, including profit.

"(a) Two Dollars ($2.00) fixed-fee per 1000 rounds packed and ready for shipment for the cartridges, Ball, Cal. .30 M2; and
"(b) Three Dollars and Sixty Cents ($3.60) fixed fee per 1000 rounds packed and ready for shipment for the Cartridges, Armor Piercing, Cal. .30 M2; and
"(c) Three Dollars ($3.00) fixed-fee per 1000 rounds packed and ready for shipment for the Cartridges, Tracer, Cal. .30 M1; and
"(d) Eleven Dollars ($11.00) fixed-fee per 1000 rounds packed and ready for shipment for the Cartridges, Armor Piercing, Cal. .50 M2; and
"(e) Ten Dollars ($10.00) fixed-fee per 1000 rounds packed and ready for shipment for the Cartridges, Tracer, Cal. .50 M1."
[8] Title 18, U.S.C. § 80 [1948 Revised Criminal Code, 18 U.S.C.A. §§ 287, 1001] is a criminal section, to the same effect as Section 231.
[9] Generally Grade A ammunition covers ammunition primarily intended for use in aircraft, and Grade B ammunition covers ammunition primarily intended for rifles, automatic rifles, machine guns for ground use.